**UNITED STATES of America**

v.

**Mitchell UNTERMAN, Defendant.**

**No. 76 Cr. 201.**

United States District Court,
S. D. New York.

Oct. 28, 1976.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for the U. S.; Robert J. Jossen, Asst. U. S. Atty., New York City, of counsel.

Mr. A for defendant Unterman.

## OPINION

IRVING BEN COOPER, District Judge.

Deficiencies in the conduct of some defense counsel on the day of sentence can so acutely interfere with the functions of the sentence that they should not be received with amiable toleration. This is so in all cases—the hardened offender, the recidivist, the first offender and youth. The misapprehension of counsel in this regard often seems to be based upon a want of understanding rather than upon any conscious purpose. Clearly unprepared at sentence, they denounce, as they may, the court, its agencies and the community, and do so in such fashion as to leave defendants with the impression that they are more sinned against than sinning.

To waste that right without reflection or cause fails to enlighten the court, is demeaning to the profession, and most importantly risks lasting harm to their clients. Such an approach by counsel often thwarts the judicial purpose, particularly in planning steps aimed at possible rehabilitation of certain defendants.

Our concern with this throbbing problem has been simmering all too long; we have continually fretted and repeatedly warned counsel about it; we have wanted to speak out; the Unterman case precipitated our resolution.

When Unterman came on to be sentenced last July, his attorney, in open Court and in the presence of his client, heatedly attacked the medical report relating to defendant (including psychiatric and psychological findings) which we had theretofore ordered pursuant to 18 U.S.C. § 4208(b) so as to be better prepared to impose a sentence fair to defendant and community alike. Although he had neither applied for (Fed.R.Crim.P.

32(c)(3)(E)) nor seen the medical report, he emphatically declared its conclusions flimsy and urged their discard. Clearly encouraged by his attorney's biting denunciation, defendant firmly pressed for his immediate freedom and indicated that anything short thereof unthinkable and unworthy.

Several weeks before, the defendant (his attorney present) had entered a plea of guilty to six felony counts charging him with possession of stolen mail and forgery of U. S. Treasury checks (Title 18, U.S.C. §§ 1708, 495).

An enlightened and informative pre-sentence probation report suggested that further inquiry into defendant's medical background was desirable and accordingly defendant was committed pursuant to law. It arrived in due course and was before us on the day of sentence which commenced in proper fashion. The Government had "no statement to make." [1] Defendant's counsel offered the opinion that his client was not a "powerful figure" because his victims were poor people. "His is not the kind of fellow with enough nerve to attempt a bank robbery. . . . [t]hese relatively insignificant people have been hurt by his actions." Counsel then suggested that while working at Lewisburg Penitentiary where the medical testing was conducted, defendant became aware of the fact that he could work and enjoy "the steady, routine parts of life" and concluded with "he would very much appreciate an opportunity on probation. . . ."

Called on for allocution, defendant expressed himself positively: the few months of incarceration had been a "hard lesson but instructable . . . no future in the criminal activity I was engaged in . . . I could get a job . . . in the legal life . . . and make every effort to hold it . . . I am asking for a chance to prove myself."

We regarded it appropriate to read into the record excerpts from the summary submitted by the Office of the Regional Di-

---

1. This and other excerpts taken at the first sentence proceeding appear in court minutes on July 28, 1976 at pp. 1–13; the second proceeding, pp. 1–18.

rector of the Bureau of Prisons: "Mr. Unterman has experienced numerous arrests and previous confinements as an adult offender for various offenses involving fraudulent behavior. He is serving his third period of confinement. He has a high school education and possesses average intelligence. However, he lacks motivation and has no history of employment. Mr. Unterman has no history of mental illness, and recent psychological evaluation does not suggest any problem in this area. His behavioral traits are, however, indicative of sociopathic character disorder, and he is deficient in his ability to control his impulses at the present time. He functions at the 11th grade level educationally. He has no history of drug abuse and is in good physical health. A sentence should provide an opportunity for Mr. Unterman to participate in a correctional program designed to meet his counseling and vocational needs. It should also provide for a period of supervision upon his release."

We listed the factors favorable to defendant all of which we told him "[y]ou're throwing . . . in the waste basket." It was then that counsel became aroused. As to medical reports in general that he has read, they "are perceptive but . . . the conclusions, based upon the data that they gather" are unreliable. He firmly believed that "the prison system today . . is not, by any stretch, ever to be used for rehabilitative purposes." Further, "whereas opportunity should be made available for people who are deficient in one way or another in institutions, it should never be imposed upon them."

Counsel expressed the belief that since his client had "the incentive to undertake responsibilities himself, that is the place where it should be tested, in the real world rather than on the artificial turf, so to speak, of the prison system." He suggested that the only alternative, if incarceration was contemplated, was to mete it out exclusively as punishment because "the rehabilitative idea" is not "the correct view. . ."

Thereupon the defendant spoke up and took vehement exception to the medical report's statement "that I am unable to control my impulses." He insisted otherwise.

We declared the defendant "has values that can be worked on and help him to get his feet on the ground. . . . We are concerned with the future development of this man . . . and [a] strong belief, confirmed by legions of instances where a program of rehabilitation, including vocational training, which this defendant is sorely in need of, may very well see him on the right road."

We imposed a sentence of three years to run concurrently on each of the five counts, with credit for time already served. This brought counsel's belated request for an examination of the medical report; we reserved decision and upon receipt of his later written request, granted permission. We resolved thereupon to express at a later date our impressions of this and similar unfortunate approaches to the sentencing objective and the irreparable damage frequently visited upon both defendants and community by such misguided effort. We closed the proceeding by setting aside the sentence imposed, directed that all else remain on record, and adjourned the matter.

To his credit, defense counsel on the adjourned date realigned his value of the official medical report: "this particular one is excellent. Frankly, as much as the conclusions can be [depended] upon, I think they are pretty accurate too. I see Mr. Unterman in much the same way . . . . I have told him in my opinion if I was the judge I don't think that he deserves much of a break . . . . The weakness of his prey is an indication of his own wit." However, counsel persisted, "I don't think that he is going to get anything out of prison . . . [i]n spite of the fact he needs skills, he has nothing to sell . . . [and while] he clearly does not deserve it . . . " place him on probation.

It was apparent that the defendant was somewhat startled at his attorney's revised estimate of him. In sharp contrast to his first allocution on July 28th, he addressed

the court in a subdued tone. "It is not a question of what I deserve but maybe what I can benefit from."

We were encouraged and told counsel he was now "standing in the role of an advocate for justice . . ." and not committed, as many lawyers, to the belief that their sole mission on sentence day is summed up with, "my job is to get my man out." We attempted to point up the harm done a defendant when on sentence his attorney denounces the court, its agents and official departments. After such tactics "[w]hat other deductions can a defendant have with regard to his sentence . . than to take comfort in what [his] lawyer says almost in defiance."

■ The attorney is not expected to hold his tongue when an unwarranted assertion of any kind (minor or major) is made inimical to the best interests of his client, no matter where it comes from. But this should be done "as a professional without unfairly denouncing those instrumentalities, weak though they may be, in need of sharpening though they may be." We emphasized that an attorney should always recognize the impact of the proceeding on the future destiny of the defendant.

We wound up the proceeding by making a part of the record "the probation report which cries aloud for some kind of guidance to the end this defendant shall not [meet] the rest of these years in emptiness and further criminal behavior . . . he is not a newcomer to the field of crime." We expressed a "certain faith that within this fellow there is a reserve of decency that we can alert, a new courage, but he is the only one [who] can release it." We promised that if he demonstrated to our satisfaction that his deportment while incarcerated shows promise, we would urge the parole board to consider him for early release.

### The defendant's personality profile

Just who was this defendant? On the day of sentence he insisted he should be set free because he could manage for himself and promised no further "contact with the law." He took violent exception to the statement in the medical report that "he is deficient in his ability to control his impulses. . . ." His attorney blandly offered the assurance that the defendant now recognized that he could "enjoy the steady, routine parts of life." These easy assurances were offered as though the court had not been educated in detail by the probation report as to defendant's character. In our court sentencing has long ceased to be based on first impressions. Off-hand assurances are useless to the sentencing judge.

The probation report on Unterman, to which no mention whatever was made by defendant or his attorney on sentence (permission to examine it had been granted long before), states that on 11–5–75 postal inspectors were advised by agents of the U. S. Secret Service that defendant was detained because he answered to the description of a poster circulated theretofore by their office in an attempt to locate a person who uttered a forged U. S. Treasury check on 11–1–74 payable to one A. J. in the amount of $264.—the check made the subject of count ten to which he had pled guilty before us. On that occasion a search of defendant produced three Authorization to Purchase Food Stamp coupons stolen out of U. S. Mails.

The probation report continues: Unterman admitted to a Secret Service agent "that he was the 'middleman' in checks in the 145th Street and Broadway area. He advised that individuals would bring him stolen checks and it was his job to have them cashed. He received one-third of the total amount of the check for his efforts. He further advised that the three Authorization to Purchase Food Stamp coupons that he had on his person when detained by the New York City Police had been given to him by an 'unknown' individual to have exchanged for money."

The defendant had agreed to cooperate with postal inspectors in their continuing investigation of illegal check cashing, but attempts to contact him proved unavailing; he had dropped out of sight.

Postal inspectors on 11–29–75 observed defendant in a Manhattan hotel lobby. He had in his possession three City of New York welfare checks and a coupon similar to the one mentioned above "all of which he admitted had been stolen from the U. S. Mails." These checks were for $75., $114., $65.65; the coupon entitled the legal owner to $83. worth of food coupons.

Subsequent to his arraignment in the case before us on 12–30–75, defendant was rearrested on 2–10–76 at the premises of a check cashing service in the Bronx "in the process of negotiating a stolen U. S. Treasury check dated 1–12–76 in the amount of $714.40. . . ." He took the position that "he had received this check from an individual known to him as 'Bob' and had agreed to cash the check for payment of one-half the face value."

On 2–11–76 postal inspectors interviewed one G. G. who related he had neither received his check (involved in one of the counts herein) nor authorized its negotiation; that on a previous occasion he had "chased an individual out of the hallway of his building and away from his mailbox." He identified defendant as that individual.

The postal inspectors also revealed that on 2–17–76 they learned from the manager of another Manhattan hotel that "in the process of cleaning room 208, which Unterman had just vacated, the custodian had found eight State of New York Unemployment checks and six City of New York Department of Social Services checks totalling $1,252 in value. Also found in his room were 23 Chemical Bank Master Checking Cash advanced checks in the name of other individuals."

On 3–8–76 defendant failed to appear for pleading in this case; a bench warrant was issued and on 3–19–76 he was taken into custody.

The FBI furnished the court with defendant's prior fingerprint record: In 1962 he was charged with forgery and petty larceny and sentenced. In that case he had defrauded one J. F. of one dollar by forging

the name of G. H. to a receipt for "the blind" which defendant handed to J. F., the donor. In 1965 he was charged with forgery and sentenced. There he had used a Veterans Peddling license "on which he had forged that he was selling goods for the blind." In 1967 he was charged with forgery II, petty larceny, loitering and sentenced (no details furnished). In 1969 he was sentenced following a charge of forgery, possession of forgery instruments, criminally impersonating another, criminal trespass (no details).

The probation report continues: Defendant's father, a real estate broker, always supported his family; defendant "now believes his parents are existing on the edge of poverty . . . he continues to have a symbiotic relationship with his elderly parents and even to date dines at their home a few times a week and allows them to give him food packages. It is our impression, that the Untermans remain very protective of the defendant although when we spoke to his father, Unterman, Sr. very strongly expressed the opinion that his son needed psychiatric help and acknowledged that he had completely failed in his efforts to help him."

The defendant "sees himself as a loner"; during most of the past twenty years he has lived in rented furnished rooms. He graduated from high school, scholarship above average, in the honor class, no record of misconduct; neither drinks nor smokes, no history of drug usage; never married. From June 1955 to November 1956 he served in the U.S. Air Force, given a general discharge under honorable conditions due to his inability to adjust to military life.

He was cooperative with the probation officer, described himself a radio "addict" spending a great deal of time in his room.

As to employment: "The defendant admittedly has had no regular employment in the last 16 years. He related that the last job he had was as a door to door salesman of handicraft items made by the blind. However, he says his experience at this occupation was that most people were not

interested in buying any products but would hand him a quarter or a half dollar to assuage their conscience and then simply shut their door. It was this experience he says that led him to decide to pursue this occupation on a free lance basis and from approximately 1960 to 1970, Unterman says he supported himself, never represented that he was blind but only that he was selling products made by the blind. Since 1970, Unterman says his primary means of support has been public assistance. He says it was only in late 1974 that he first began to involve himself in the passing of stolen and forged government checks."

In the closing portion of the probation report this appears: "The defendant completely admits his guilt and says he engaged in these activities solely to obtain money and claims he is now ashamed of himself."

We come now to the medical report. We find it of considerable assistance in aiding us to understand who is before us for sentence. Detailed and impressive, the study reveals him a rather inadequate person, poorly organized, having "weak behavioral control," immature and dependent. The medical staff believes he could gain insight into his abilities and limitations by participating in group counseling.

The report includes: "He verbalizes remorse for his involvement in this offense and openly admits that prior to this period of incarceration he had no respect for the law." Further, "he appears to be committed to a criminal value system." He declared it "a mistake for the court to place him on a low bail . . . because if he had been kept locked up he would not have returned to crime . . . he stated he would need strong, firm control."

The doctors found his responses relevant and coherent, no obvious indications of "thought disorder, gross mood disorder or memory defects" and concluded "there were no clear indications that he is motivated towards change at this particular point in time. . . ."

### The defendant's letters

We received three letters from defendant; we regard two somewhat revealing. On May 10, 1976 he wrote, "[a]lso advise the court that in the two months incarceration I have had plenty of time to contemplate my life & try to rearrange my priorities in a constructive rather than a self destructive manner."

And on April 5, 1976: "I obtained the government checks from another party. I would then either proceed to attempt to cash the checks and if unsuccessful transfer them to another person. I am fully aware that the activities I was engaged in was inconveniencing the intented [sic] recipients. After awhile this activity caused me to lose respect for myself and I would groom and dress poorly, live in shabby surroundings—I hope the remainder of my life will be spent more constructively. I like working among people and wish assistance from the government if possible. I realize that I could use counseling and firm guidance to my benefit."

### The Hayes case

Conclusively pointing up the harmful effects of the problem we here endeavor to emphasize, we presided (two weeks before Unterman) at the sentence of a hardened offender (with a most serious prior criminal record) who had been found guilty by jury of four counts of armed bank robbery and one count of assaulting a federal officer. The defendant's attorney delivered a veritable Philippic against the probation officer who had rendered his report. The attorney regarded it so "loaded against the defendant"[2] that, in his view, sentencing before another judge was imperative. We made it abundantly clear that the report left "no such impression as you envisage" and proceeded to impose sentence.

Later that day, the probation officer received a telephone call from a person who stated she was the defendant's mother and had been in the courtroom throughout the entire sentence proceeding. She threatened him: his written statement to us includes,

---

**2.** All references are to sentencing proceeding in *United States v. Hayes*, pp. 660–677.

"called me 'a dirty Jew bastard' . . ." and stated that she "would get [me] for this. . . ."[3]

## Dilemmas of sentencing

The complexity of conflicting factors that arose in sentencing Unterman is common. The complexity is aggravated by cryptic clues and missing pieces in the data that reach the court. The resources available to the probation office are not unlimited and frequently the sentencing judge feels himself groping.

After interminable hours of listening to charges and counter-charges, quibbling and evasions; painstaking establishment of self-evident facts; and the final officially established legal description of an act, judges often find themselves merely at the beginning of what they should know in order to act professionally. What judges want to know, at this point is: Why did he commit his act? Others about him somewhat similarly placed have not so acted. What was there in his experience to turn him criminal? What of his home, his relations with parents, siblings and neighbors? With social institutions? With peer groups? With friends and boon companions? Who has influenced him? After whom did he mould himself? What variety of activities did he participate in? What has work, love, marriage, parenthood meant to him and how has he behaved in these relations? Most important of all, what variety of opportunities was open to him? Did he participate in his culture and cherish it? What interests does he now have? What skills? Whom does he love? Hate?

Insofar as a sentence is a prescription for remedial treatment of the crime as a given personality syndrome, judges must have information about the constitution of the delinquent and the extent of his moral involvement. And so there are more vital questions: How normal, in physical health, mentality, emotional stability, capacity for sustained effort is he? What were the provocations provided by the complainants; and by the community in which he was reared and which set the behavior patterns after which he moulded himself? How powerful are these upon him now? What capacity for sound living has he shown to date? What is his ability to learn to integrate new experiences? What is his moral potential? What resources will be needed to free this potential? Who stands ready to help him? Can he learn faster in the community or does he require to be withdrawn from associations and conditions in which he has been formed? What kind of community will give him the support he must have? What incentives can the community provide to help energize his will?

It is inadequate answers to these inquiries that pose the dilemmas of sentencing.

In order properly to mete out sentence, we must be concerned with another aspect of the defendant's career which is easily lost sight of by accusers and defendants. That is the degree of fault which inheres in the nebulous "community." What of the offender's parents and their relation to each other, of his brothers and sisters and relatives? What of the neighbors and the neighbors' children? What of the multi-family tenement structures in which he has lived? Was strife and thievery, as with the Spartans, the mode of the neighborhood, a black eye a decoration and not a reproach?

The key to intelligent sentencing, therefore, is the court's knowledge of the amount and kind of disciplinary action, in the light of the offender's moral standards and educability (capacity and rate of learning), that will be needed to restore him to his place in the community with sound attitudes toward it.

Today's social problems have become so vast and so complex that in all fields of professional service an inter-disciplinary approach alone makes sense. If we treat the whole man, and this is the essence of the

---

**3.** We referred the matter to the U.S. Attorney for such action, if any, as he regards mete and proper in the circumstances.

modern professional approach, we must enlist the aid of the whole faculty.[4]

The "innocent community" in equal and often in greater degree is, at bottom, also morally involved. Judges, on behalf of the community, have a real, even though limited discretion, to take account of this guilt of society.

Laws define the acts which the community considers reprehensible. The community, in registering abhorrence by a punishment of loss of freedom, is in effect alerting its members to the wisdom of self-control. Law is a support to conscience. Having accepted this idea, citizens feel let down when punishment does not follow the illegal act.

From pieces and chips, the judge strains to construct a whole. The defendant may be a determined offender.

### The determined offender

Against the "peace and dignity of the people" he presents a challenge not to be evaded. The right to move safe and unmolested through the city, to be secure at work and at home, to be protected against frauds and schemers, is the supreme luxury of civilization. For it the community pays a huge price, and is intolerant of failure or lag on the part of its agents and instruments. It cannot be patient with or concerned about the welfare of offenders while they threaten its security and comfort.

A small but important proportion of these may be called predetermined—the criminal insane—who are committed to appropriate institutions. There are morally obdurate individuals who brazenly proclaim "evil, be thou my good." They fill the prisons, and the law seeks to discover and remove them from the community. There are crafty professionals, whose aim is to bleed the community's resources for their own pleasures, using the instruments of the law itself in carrying out and safeguarding their operations and personal safety. There are the misguided idealists ready to sell out the community itself for the satisfaction of realizing a personal vision.

### First offenders and youth

Many defendants are first offenders, "little people" in the matter of possessions and what is commonly considered social importance. Most of them are decent, law-abiding human beings, who in a moment of excitement, strain, or depression gave vent to impulses whose strength they had rarely admitted to themselves, and became enmeshed in the criminal law.

What do you do with the brilliant college student who resorts to thievery so that she can look pretty when she is married in a week or two? With the university boy who in a moment of silliness commits an act that brings him before the criminal bench? With the attractive young lady who has become a drug addict and wants to marry the source of her supply—a man with a long criminal record?

Generally speaking, every first offender is a potential recidivist. The stake which the community has in the legal process is that he should not actually become one. The object of sentence, then, should be to fit the punishment not to the crime, but to the offender.

A common factor in many cases is that, set against the life situation, the criminal charge lacks major importance. Where there is so much deep-seated misery one additional increment does not seem to matter too much. The life situation may inhere in the defendant's relations to his mother or father, to his family tradition, to his neighborhood associates, to the social situation of his school or shop or other place of employment, to the standards of the community as

4. Mr. Justice Cardozo: "Run your eyes over the life history of a man sentenced to the chair. There, spread before you in all its inevitable sequency, is a story of the rake's progress more implacable than any that was ever painted by a Hogarth. The Correctional School, the Reformatory, Sing Sing, or Dannemora, and then at last the chair. The heavy hand of doom was on his head from the beginning. The sin, in truth, is ours—the sin of a penal system that leaves the victim to his fate *when the course that he is going is written down so plainly. . . .*" (emphasis added)

these are reflected in the magazines, papers, movies, actions of important people, envy of others. Treatment involves dealing with these primary causes.[5]

### Enlightenment from defense counsel

Unwilling to let the court deteriorate into a swift moving panorama of human misery, and seeking light to dispel the shadows, the court turns in hope to defense counsel. Of all the officers of the court, he is closest to the defendant and is most nearly trusted by him.

It is particularly distressing that many attorneys for the defense, who have proven themselves competent as to the facts and law in the case at trial (including counsel in this case), display on sentence hardly more than a faint glimmer as to who their clients really are as human beings. Thus it is that they come totally ill-prepared to advance or meet the vital disclosures which sentencing makes imperative.

Too often it is an appeal in general terms for compassion and the empty comment, "You'll never see him in any court again." Then again the plea is that the felonious behavior of the client should be excused because of his personal weaknesses (drugs, alcohol, sex, other disadvantages).

When it comes to the young first felony offender, the lack of thorough preparation for sentence can be calamitous. Possible rehabilitation is thwarted when his counsel insists that his youth is the open sesame to immediate release from the law's grip. He might as well argue that regardless of the extent of his injury or the advanced stages of his infection, all youth should be medically treated but never by way of surgery. The burden is extremely heavy for all participants at sentence, for they must assist in accurately identifying the youthful offender with good moral potential who can be safely returned to the community to line up with the orderly citizen, from the hair-trigger, perverted or psychopathic first offender desperately in need of institutionalized care. Indeed, "possibilities of murder . . . are inside all the least likely skulls."

### Sentence as a therapeutic procedure in which counsel participates

Counsel unprepared at sentence not only fail to enlighten the court, they can actually do lasting harm to their own clients.

The act of apprehension, often with its searing publicity, the wait in detention facilities, the notification of family or friends to secure their help is frequently humiliating; the necessity to obtain bail and legal assistance, to secure witnesses, verify facts, bear the scrutiny and gossip of persons who had not before been important, to rehash the bitter details of the overt act and its aftermath, the long delays and disappointments which precede the appearance for pleading and trial, the crushing effect of fingerprint—this thorny path often forces offenders to begin to think deeply.

Often, mixed with blaming others, the defendant begins a search within himself for the power to transcend the course he has followed. If and when his native powers can be reached and engaged, they frequently turn out to be substantial. And the recuperative powers of aroused and alerted defendants are often amazing. Indeed, there is a small, but real minority of offenders who exhibit a considerable fund of moral understanding. They themselves reach eagerly for the rod, and possess the will to acknowledge, accept and use the lessons to be learned from their acts.

---

5. In a free society such primary causes must often be tolerated; in any event finite resources cannot undo all evils. Erich Fromm's observations on this point, in his "Escape from Freedom," is strikingly factual: "It would seem that the amount of destructiveness to be found in individuals is proportionate to the amount to which expansiveness of life is curtailed. By this we do not refer to individual frustrations of this or that instinctive desire but to the thwart-ing of the whole of life, the blockage of spontaneity of the growth and expression of man's sensuous, emotional, and intellectual capacities. Life has an inner dynamism of its own; it tends to grow, to be expressed, to be lived. . . . The more the drive toward life is thwarted the stronger is the desire toward destruction; the more life is realized the less is the strength of destructiveness. Destructiveness is the outcome of unlived life."

The problem, again and again, relates not alone what such an offender had done, but what had he become? How do you go about certifying that such a person, once toxic and infectious, might really now be charged with positive health? For repeatedly we have witnessed a defendant erect a platform of self-deceit and on it go down to defeat, and while clinging to it, like the Phoenix, ascend and conquer. Those who really care must be prepared to participate in recriminations and discouragements, in false starts, failures, hard ascents and periods of slow gain. He must see his client to the point where he can keep pace with his peers.

To the awesome day of sentence then come defendants whose surging thoughts include yearnings to renounce the worst parts of themselves. It is our conviction that the position of the judge, and his participation during the period of pre-trial and trial, often given him almost unique power to interpret defendants to themselves, and to involve the community responsibly in the recuperative process.

Judges, like educators, are aware that large classes and stereotyped instruction produce poor results. Further, like physicians, they must depend heavily on the recuperative powers of life itself, and trust to a reoriented will to stabilize character. The resources of the court should be lined up solidly behind the delinquent who can demonstrate his will to moral recovery. One of the lacks in the reformative and re-educational process for the delinquent, is a fixed point of orientation in his situation, which does not waver, to which he can refer, and to which he can be called back.

The court seeks to save the offender, not from the results of his crime, but from his own greatly increased capacity for self-destruction and from the often unconscious vengeance of the community. The habit of failure is insidious. The patience and chari-

ty of the community toward the wrongdoer is short. These hard lessons the court tries to impart to those it would help.

When it comes to the day of sentence—the good, the bad, what was said or omitted, etc.—makes an unforgettable impression on the defendant.

In the moderately favorable case, the shock of his situation, rather than of his acts, makes a profound impression. He emerges from his ordeal with an overwhelming conviction that the nets of the snarer are all about. In the most favorable instance, he is morally alerted, stabilized and in considerable degree integrated.

But the day of sentence can also be pathogenic. For years after the defendant may relive the throbbing event in his life, discover new flaws, bitterly blame those he believes responsible for his sad plight and take on a new, deep-seated lament, resentment and hatred.[6]

Much of this we hold could have been obviated; the defendant has enough to contend with without his attorney—always a law abiding citizen—casually mocking the shortcomings of the judicial process.

As in the case at bar, attorneys who have nothing of value to offer on sentence, frequently persist in hammering away vainly and in general terms at the probation officer. In his easy mouthings, the attorney is utterly blind to the unfortunate, sometimes tragic impact felt later by his client. Chances of effective rehabilitation lost, many a defendant grasps for comfort at his attorney's hollow scorn rather than seek a constructive prison program aimed at rehabilitation and re-entry into the community.

All too frequently, some attorneys content themselves with the argument that mitigating factors excuse the crime itself. Almost inevitably this hollow contention indeed makes defendants feel more sinned against than sinning.[7]

---

6. We have learned much, over decades of judicial work, from defendants we placed on probation, suspended sentence, or committed for short or severe terms of imprisonment. Our principal learning has come from extensive and intensive conferences in chambers with defendants, their attorneys, prosecutors, probation officers, men of medicine, etc.

7. In still another recent sentence (Oct. 12, 1976,

A felony conviction is a most serious matter and must be faced up to. Attorneys are well advised to profit from the exemplary manner with which such an endeavor was carried in a case before us. The prosecutor had sharply excoriated the defendant for his machination in bribing a public official. Instead of resorting to the ineffective pleas so harmful to defendants, counsel for defense in that case frankly stated he shared the prosecutor's estimate [8] and then ably proceeded to put before us other impressive life factors favorable to his client.

How much more honest, enlightened and cogent is that approach, rather than the one followed by those attorneys who, without even commenting on the iniquity of proven felonies, are moved to observe: "What did my client do that's so bad? It isn't murder!" What we deplore about the pointlessness of the assertion is its harmful effect on a defendant who, upon receiving a sentence in excess of what he or his attorney expected, becomes irreconciled to what he brands excessive punishment for a "minor" infraction of law, as his lawyer in open court so boldly complained. As we said to counsel here, "You take a whole life and you embitter it."

### Counsel for defense

The pride of the legal profession is its unalterable belief in the equal rights of all human beings to human dignity; its unswerving determination that even the avowed enemy of our present system of society, will have his day in court and justice will be done.

It is the opportunity and obligation of the lawyer, as it is of other professions, to treat situations and conditions rather than symptoms. The physician who, because of ignorance or failure to use the far flung resources of the community which bear on his art, delays his patient's recovery, extends his pain, increases his financial loss, perhaps weakens his basic physical structure, leaves a great deal to be desired, even though his patient lives. And so we must recognize that a legally established degree of offense is an unsatisfactory index of moral potential; that the percentages of "cures" obtained with our present pharmacopoeia of corrective ingredients and dosages are profoundly discouraging; and that the hazards to courts, communities and offenders in treating offenses rather than persons are considerable.

The obligation of lawyers toward criminal clients is to protect their rights and liberties and to advise them on how best to fulfill their obligations under the law. It is a commonplace that while ignorance of law excuses no one, public knowledge of elements of jurisprudence is woefully deficient. Youth, especially, is usually ill-informed. Lawyers have a considerable opportunity to help re-educate their clients, realistically, as to the demands of community upon them, and the machinery which public authority employs to guide and discipline its members. There are many instances in which attorneys have become a moral guide and bulwark to delinquents during the period in which they are revising

*U.S.A. v. Grant*) defendant's lawyer found justification for his client's confessed embezzlements: "There is in the law something called the [attractive] nuisance doctrine, as your Honor may recall. Unfortunately, he was a teller in a bank. Tellers earn pitifully little money, in my judgment. I represent many, many tellers, young men and young women—no prior records, no drug addiction. They get paid on the order of $120 or $130 a week, in our day and age. They handle literally millions of dollars. To resist the temptation requires perhaps a little more fibre than Mr. Grant had in those days, especially when you consider that he was then addicted." Not a single word came from him that his observation did not excuse defend-

ant's felonies. We were constrained to call attention to a primary, fundamental truth: "The defendant should know from the lips of his attorney . . . [that] what he did was dead wrong." This evoked from counsel: "I would not want my folly to be to the detriment [of my client]." What temerity!

8. Judge Rifkind, on an application before us to reduce a sentence imposed, *U. S. v. Birnbaum*, 61 Cr. 991, stated: "I am sensitive to the fact that the defendant stands today convicted of a peculiarly unattractive offense, and I have read in Mr. Fleming's [Assistant U.S. Attorney] statement some words of revulsion at the offense described, and I share his revulsion."

their values and their behavior patterns. There is every reason why lawyers should exercise an "educational" function.

Lawyers are in a very special situation to assist courts and probation departments by providing information about their clients' backgrounds and human needs. The possibility of his service is not finished when a delinquent has pleaded, or been adjudged, guilty. He is now in a position to assist probation workers to render maximum help toward his client's rehabilitation. His interpretation of the function and processes of sentence, probation, and institutional treatment, can lift his client's morale to a higher level.

Doubtless as much, and perhaps even more, acumen and skill is required of counsel to collect, organize and present at sentence data vital to a defendant as is required to describe the offense, gather, arrange and verify the facts about what took place, observe the rules of evidence, and assess the harm done to complainants and community. It is a tremendous undertaking, indeed. Further, it is high time that counsel start to be aware that the law does not require a judge to anesthetize his emotional reflexes. "Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference. . . . Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine." *In re Linahan*, 138 F.2d 650, 652 (2d Cir. 1943).

SO ORDERED.