**UNITED STATES of America, Plaintiff,**

v.

**Michael PAPPADIO, Defendant.**

**No. 78 Cr. 936 (IBC).**

United States District Court,
S. D. New York.

Oct. 22, 1979.

---

3.   *USAF v. Rose*, 425 U.S. 352, 369, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1969).

Robert B. Fiske, Jr., U. S. Atty., S. D. New York, New York City, for U. S.; Steven K. Frankel, Asst. U. S. Atty., New York City, of counsel.

Bandler & Kass, New York City, for defendant Pappadio; William J. Werner, Richard L. Gold, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

This application (received October 17, 1979)[1] for an order to show cause made returnable October 19, 1979 at 3 p. m. is still another attempt by defendant to avoid compliance with our order that he surrender to start serving the sentence of one year we imposed on May 31, 1979. At defendant's request the first surrender date was set for September 5, 1979. Subsequent applications by defendant resulted in four changes in the surrender date, the last being October 24, 1979 marked peremptorily against the defendant.

As on prior occasions, the main thrust of the applicant's position is that he is seriously ill and confinement in a hospital operated under prison authority, even with medical attention provided for, would further endanger his health. He asks us to order and conduct *another* medical hearing. An exhaustive medical hearing was held before us on March 21 and 22, 1979 after we experienced considerable difficulty getting the defendant to appear for arraignment.[2] The medical testimony adduced by both sides, in addition to the testimony of the physician designated by the Court, compelled us to comment and conclude as follows (extracts from the official court reporter's minutes consisting of a total of 125 pages):

> Counsel, as we see it, after deliberation, close scrutiny and as thorough an analysis as we can possibly engage in, we find that quantitatively and qualitatively the testimony adduced at this proceeding is overwhelmingly in favor of the Government's position. Accordingly, we grant the Government's motion and we deny the motion in opposition. This Court enters a finding that mentally and physically this defendant, Pappadio, has the capacity to stand trial on the date heretofore fixed, to wit, April 23, 1979 at 1 p. m. (p. 120 of the minutes)

1. The instant motion papers were filed with us last Wednesday afternoon (October 17th); they incorporate an application for a stay of the surrender date and opportunity to appeal if the instant application is denied. We struck it and so advised counsel by telephone before the close of the same day. Last Friday afternoon (October 19th) we filed our order denying the application in all respects and noted that we intended to file on Monday (October 22nd) a memorandum setting forth the reasons which prompted our disposition. Counsel were so advised in full by telephone before the close of last Friday. Despite the belated filing date of the extensive papers making up the present application for relief, we expedited our study of all the pertinent material and our resolution of the matter in order to afford counsel the opportunity to take such steps as he deems advisable under the circumstances.

2. Promptly and repeatedly after the filing of the indictment on December 21, 1978, we took steps to get the defendant into Court for arraignment. We were unimpressed by the excuses offered in his behalf, stated we were prepared to issue a warrant and fixed February 28, 1979 for his appearance solely for arraignment. He failed to appear on that day. His physician arrived instead and testified that due to defendant's "degenerative arthritic condition," he was unable to attend. As subsequent events overwhelmingly established, defendant on that day, as well as before and after, misled the Court.

At no time did we belittle the true physical ailments of this defendant. We repeatedly expressed our sympathy but we still refuse to adopt (in fact we cast aside) defendant's unwarranted lament that he is in a "life-threatening condition." (He urges upon us *Roba v. U. S.*, 604 F.2d 215 (2d Cir. 1979) wherein a factual situation existed readily distinguishable from what confronts us here.) At the time of sentence, we accorded the defendant every appropriate consideration—an approach that was only fair and proper. *United States v. Unterman*, 422 F.Supp. 228 (S.D.N.Y.1976):

How serious is your illness? I have little doubt that it is very serious. What do I base it on? I'm not a doctor. That issue has been thrashed out. I appointed a doctor in whom I have absolute confidence to examine you in addition to the doctors that you had, and I listened to all of them . . . . I'm convinced that you are a seriously ill person. . . . I read from a very substantial part of Dr. Gittler's report, the doctor that I appointed: "Mr. Pappadio has degenerative arthritic disease of the cervical spine with radiculopathy. He has similar degenerative disease of the lumbar spine and possible discogenic disease with sciatic neuropathy. He also has essential hypertension and possibly underlying rheumatic heart disease with mitral insufficiency." That is nothing to cover up. It enters into a judge's sentence, as it should. I don't for a minute take any satisfaction in your serious physical condition. All I'm mentioning is that that is a factor that operates in your favor, as does your plea of guilty. These are the factors I must take into consideration or my conscience would be outraged. (pp. 16, 17 18 minutes of May 31, 1979)

### Unterman

We take very seriously the sentencing process, insisting on discovery and careful evaluation of all factual material that can possibly be accumulated, to the end that the proper, appropriate and fitting sentence is imposed so that justice is done to each defendant and community alike. Such has been our positive approach during four decades of judicial effort. We said so in *United States v. Unterman*, 422 F.Supp. 228 (S.D.N.Y.1976).

### Medical hearing

■ Much emphasis on defendant's behalf, developed at the medical hearing, dealt with his degenerative arthritic condition—just as it is emphasized again now. Yet from his personal physician for many years (Dr. Klinger) came this testimony (p. 106):

Q Is it fair to say, Doctor, that degenerative arthritis of various areas of the spine and neck is not uncommon in middle-aged or 56-year-old American males?

A No, it's not an uncommon thing.

Q The type of treatment and medication you prescribed to help or alleviate the pain is not an uncommon course of treatment?

A An uncommon what, sir?

Q Course of treatment.

A No, it is not uncommon.

Q In fact, it is fairly common; it is a regular course of treatment, is it not?

A Yes.

Q Would you say that there are many people who suffer from that condition and have had the same treatment prescribed who are working in and around the streets of New York and the rest of the country regularly?

A Yes, I have to say that.

It must be remembered that for many weeks prior to the medical hearing, defendant was adamant that, by reason of his high blood pressure and degenerative condition, even being taken to court by automobile and accorded every assistance, would endanger his life. The medical testimony adduced clearly overpowered the claim and branded it devoid of merit.

Called by the Government, Dr. Koven, an orthopedist, testified that attendance at trial would not affect defendant's arthritic condition if he were allowed to "get up and move about from time to time;" that the medication defendant was then taking

would not be "mind-altering or affect his judgment or memory or ability to make decisions" during the course of trial. (pp. 13, 14, 16)

From Dr. Gittler, the court-appointed physician, a specialist in endocrine and metabolic diseases (he had examined defendant thoroughly and filed his report with us on March 12, 1979), came testimony which defendant must have regarded as devastating: that his high blood pressure was controllable; that the life of a person with his type of hypertension would not be jeopardized by having to sit as many as seven (7) hours each day while on trial for an extended period of time (even as long as three or more weeks); that it certainly would not be life-threatening for defendant to travel one hour each day to court; that he doubted defendant would experience any deleterious effects, such as a heart attack, by attending trial; that the drugs defendant was then taking would neither affect his mental functioning nor bar his cooperation with his attorney during the entire course of trial. (pp. 50–63)

In the thoroughly detailed pre-sentence report dated October 12, 1977 (in the Brooklyn case)[3] the complete statement under HEALTH: *Physical* reads: "Medical records reflect the defendant has a chronic form of colitis and has had two attacks of rheumatic fever. He denies ever using any illegal drugs and drinking."

In our Report On Sentenced Offender, dated June 21, 1979, we stated after COMMENTS ON TREATMENT NEEDS "medical attention". According to our long-established practice, we shall write the Director of Prisons and call to his attention the defendant's physical condition and need of medical services.

The factual allegations are insufficient to warrant the relief sought. We are satisfied on the totality of all the proceedings had herein, particularly the reports and comments by defendant's own doctors, that a medical hearing is unnecessary. We refuse to capitulate to the scare created that a life-threatening situation exists. Similar urgency calls have heretofore been advanced and upon analysis found to be empty of merit. If we were impressed that a life-threatening condition existed, we could at least easily adjourn the surrender date and await development; what we are now confronted with does not even warrant that.

### *Defendant's prior motion*

On October 5, 1979 we filed our order disposing of yet another application brought on by defendant. It sought an order, pursuant to Rule 35 of the Federal Rules of Criminal Procedure, which would suspend or reduce the prison portion of the sentence we imposed; in the alternative, an order either amending his sentence under 18 U.S.C. § 4205(f) to enable him to be eligible for parole after serving one-third of his one year prison sentence or an amendment of his sentence under 18 U.S.C. § 4205(a) to change the period of his incarceration from one year to one year and one day so as to enable him to file an application for parole (not permissible under a sentence of one year). Further, the motion asked for a medical hearing addressed to his physical condition and ability to receive proper medical treatment if incarcerated. We denied that application in all respects and stated in part:

Defendant's physical condition calls for the utmost considerateness on our part. This we have exercised from the very inception of this litigation; we have been extremely sensitive to any and all issues relating to defendant's health. In March, 1979, we held two days of hearings on defendant's ability to withstand the rigors of trial. In line with our practice of sentencing the offender and not just the offense, we took into consideration defendant's health in arriving at what would constitute an appropriate sentence. We are satisfied that the sentence actually imposed reflects that concern on our part.

---

**3.** We deal with it later in this opinion.

After a meticulous reconsideration of all the proceedings heretofore had, defendant's motion papers and supporting documentation and the Government's papers in opposition, we are satisfied that defendant will receive proper and complete medical treatment and attention at the excellent facilities in Lexington, Ky.

In light of the reports by defendant's own doctors, the Government's representations as to the facilities in Lexington, and our own experience with the treatment programs available at that institution, we deny defendant's request for a full medical hearing.

A motion made pursuant to Rule 35 of the Fed.R.Crim.P. compels us to carefully re-examine the totality of the factors which entered into our sentencing determination. We have conducted this re-examination and are constrained to, and do, adhere to our original determination as pronounced by the sentence imposed. In all good conscience, we are compelled to deny defendant's application for amendment or modification of his sentence. We find neither good nor sufficient reason to disturb it. We are satisfied it stands for justice due the accused and the community alike.

On April 11, 1979 defendant appeared with counsel and after a lengthy and detailed inquiry by us, entered on the record his plea to counts 3, 4, and 7 of an indictment containing sixteen counts; four (counts 13–16)[4] charged obstruction of criminal investigation; the other twelve charged, in essence, tax evasion; the total taxes allegedly evaded in the twelve counts amounts to $602,604, and of this total $381,-614 is covered by the three counts to which defendant pleaded guilty. The pre-sentence investigation discloses a persistent and tireless series of financial enterprises in which defendant participated seemingly without let-up for twenty years up to the time of the pre-sentence report. He organized, supervised and attended to endless detail that his business interests required.

That same report discloses that his present net worth is approximately three-quarters of a million dollars; his residence (built in 1972 at a cost of $90,000 cash, $3,600 taxes annually) valued at about $150,000; his United States Individual Income Tax Returns for the years 1976 through 1978:

| Year | Adjusted Gross Income | Tax Due |
|---|---|---|
| 1978 | $210,440 | $ 92,455 |
| 1977 | 302,299 | 128,185 |
| 1976 | 162,890 | 56,495 |
| (Joint Return) | | |

*At sentence*

In sum, the total sentence we imposed on the three counts to each of which defendant pleaded guilty (each count carrying a maximum of 5 years and/or $10,000 fine) was 1 year imprisonment, probation for 4 years after release, $30,000 fine and costs of prosecution. Further, on motion by defendant, joined in by the Government, we dismissed the outstanding thirteen counts on August 1, 1979.

As to the evidence supporting the felony counts before us: Defendant set into motion, supervised, profited from and then attempted to cover up a variety of schemes to evade payment of taxes. Some of these schemes were very simple and others extremely complex. In the course of effectuating these schemes, he deceived a number of accountants and utilized various members of his family and many of his friends and business associates. Even individuals who may have been aware that their dealings with defendant were not legitimate, had knowledge of only a small portion of defendant's schemes in which they were directly involved. During 1974 and 1975 Pappadio evaded payment of income taxes in excess of $340,000.

"On interview, although unfailingly polite and ingratiating, the content of many of his responses indicate a guarded and defensive attitude. . . . It is our impression of the defendant that he is not sincerely remorseful and that he hopes to avoid or delay payment of the taxes and penalties due through the use of extended

---

4. Counts 13 through 16 charge that soon after the investigation into the defendant's schemes was begun, he advised the individuals named therein to lie to the IRS.

legal maneuvering and the placement of his assets in the control of his wife and children." (pp. 10, 16 of United States Probation Officer's report dated May 18, 1979)

We are satisfied that defendant manipulated his schemes by devices falling far short of clean, upright dealings; that he was always ready with a cover-up for his various tax evasion schemes and that he took great liberties with the truth.

We said as much at the time sentence was imposed:

This was an involved scheme that lasted over a substantial period of time. One scheme gave birth to 50 others . . . . This was a manipulative operation over a substantial period of time. . . . (p. 18 of the minutes)

Immediately after sentence was completed, this took place (p. 23 of the May 11, 1979 minutes):

THE COURT: Pappadio, at least you have the decency to shake your head because you know darn well that you are getting a break.

Pappadio: Yes, sir.

THE COURT: You know it, don't you?

Pappadio: Yes.

### Defendant's character

An insight into the defendant's character may go far to resolve the determinative factor involved here. He would have us believe that his present physical condition will worsen to the point of extreme danger if confinement to a prison hospital is enforced. Is he shrewdly, artfully and deceitfully exaggerating or playing up the true extent of his physical debilitation? From the wealth of factual material made available to us and thoroughly examined for the resolution of this application, we entertain no doubt whatever that he has resorted to such devices and attempts to accomplish exactly that goal. Our estimate of his character then is weighted down negatively.

We look to his behavioral pattern reflected by the background of his deportment culminating in his convictions by plea and verdict on fifteen (15) felony counts in the case before us and the case in Brooklyn.

It should be noted that in 1977 following a jury trial in the Eastern District of New York, this defendant was convicted on twelve (12) counts in a 16 count indictment including two counts of Income Tax Evasion, seven counts of Filing False Income Tax Returns and one count of Conspiracy.

The Brooklyn case revealed defendant as a scheming, manipulative financial operator, constantly engaged in devious undertakings with respect to his varied commercial enterprises. The criminal charges to which he entered a plea of guilty related in part to his activities in recent years while an officer and/or part owner of about fifteen companies, his weekly gross income averaging approximately $5,000. He signed employer's quarterly payroll tax returns as well as corporate income tax returns. For two of his companies, he fraudulently failed to file corporate income tax returns, thus avoiding an aggregate taxable income of $124,285.90; the tax owed thereon, exclusive of penalties and interest, was $49,745.89.

Worst of all, defendant made the perpetrated frauds a constant practice by allowing individuals to use his businesses as verification of their allegedly legitimate employment with his companies, whereas in truth those persons performed no services whatever at those firms. One example: counts 5, 6, 7, 10, 11, and 12 charged that between April 30, 1969 and July 29, 1971, Pappadio aided by one DeLorenzo filed employer's quarterly tax returns for MBH Sales, Inc. and Bidio Management Corporation which falsely listed DeLorenzo as a salaried employee. For the first two quarters of 1969, DeLorenzo was alleged to have earned from MBH Sales $6,500 and $13,000; for the first quarter of 1970 and the first two quarters of 1971, DeLorenzo allegedly earned from the Bidio firm $7,800, $3,750 and $4,050. All this was false as defendant well knew.

This nefarious scheme enabled defendant to profit handsomely, for most, if not all, the monies allegedly paid to such "employees" were actually and steadily retained by

defendant—cash received by him after processing the checks made payable to fictitious employees. It was reliably estimated that he profited thereby to the extent of $120,000 in six years.

Small wonder indeed that the United States Probation Officer, who submitted the pre-sentence report, observed, "The defendant is viewed as being a shrewd, superficially ingratiating individual." (p. 22 of report, October 12, 1977)

In his signed statement [5] on file with our Probation Department (date does not appear) in connection with the pre-sentence report in the case before us, defendant listed (apparently in his handwriting): total assets $1,095,000; liabilities $315,000; net worth $780,000.

### Conclusion

Our reaction to defendant's latest attempt to thwart this Court's mandate is pointedly summed up in the excellently detailed and forthright pre-sentence report (examined in full by counsel on both sides before sentence):

It is our impression of the defendant that he is not sincerely remorseful and that he hopes to avoid or delay payment of the taxes and penalties due through the use of extended legal maneuvering and the placement of his assets in the control of his wife and children. It is also our impression that while he had undoubtedly suffered physical pain and discomfort from his medical conditions, he nevertheless has used and is continuing to attempt to use his medical condition to delay or avoid illegal consequences of his involvement with the instant offense.

We seriously doubt that the defendant suffers from any medical condition that would be significantly exacerbated by a period of confinement. There is also no reason to believe that a period of confinement would cause excessive financial hardships for his family. We therefore respectfully recommend that the defend-

ant be sentenced to a period of commitment suitable to the seriousness of the offense. (pp. 16 and 17 of the United States Probation Officer's report of May 18, 1979)

When defendant finally appeared at arraignment and sentence (each proceeding lasted at least one-half hour) we were taken aback at his composure, the intensity he displayed as he followed every word of the proceedings. His general appearance belied his re-assertions that he was physically unable to appear in Court. Our repeated effort to get him in for arraignment was an unwarranted imposition on the Court. We remain unconvinced of the merits of defendant's opposition to carrying out the mandate of this Court. The arguments he advances are hollow and meritless. In sum, we think "he doth protest too much."

■ From all we have seen and heard in this matter, we are obligated to, and do, deny the motion in every respect. We deny the application for a stay pending appeal because we regard it as frivolous, totally devoid of merit, brought on for purposes of delay and otherwise to thwart the enforcement of this Court's mandate.

**5.** "I swear that the above schedule has been prepared by me and, to the best of my knowledge and belief, is a true, correct and complete account of my net worth, made in good faith as of ____."