**UNITED STATES of America**

v.

**Roberto RIVERA, Defendant.**

**No. S 75 Cr. 687.**

United States District Court,
S. D. New York.

July 7, 1977.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for U. S.; Dominic F.

Amorosa, Asst. U. S. Atty., New York City, of counsel.

Gino E. Gallina, New York City, for defendant.

IRVING BEN COOPER, District Judge.

### Introduction

We are called to account by defendant who charges that he has been shortchanged by virtue of our refusal to reduce the sentence we heretofore imposed. His efforts, he claims, included "cooperation" with the Government. We have retraced the steps taken in his case. These revelations relate to a particular case, but it must be remembered that they are generic in character.

Defendant has moved to reduce sentence pursuant to Rule 35, Federal Rules Criminal Procedure. So numerous and frequent has this type of motion become that more than a perfunctory disposition seems requisite. For the reasons which appear below, this motion is denied in its entirety.

Rivera was indicted, along with 18 other defendants, on July 10, 1975 for conspiracy to violate the Federal Narcotics Laws and a substantive violation thereof. On September 25, 1975 (during the first week of trial), he pled guilty to count one, the conspiracy charge.[1] At that time, and on defendant's motion with the Government's consent, we ordered dismissed count 12, the substantive charge.

On January 21, 1976, we sentenced defendant to 15 years, plus six (6) years special parole, which sentence was to run consecutively with a sentence of 15 years imposed by Judge Cannella on October 4, 1974 for a separate violation of the Federal Narcotics Laws.

Defendant moved to reduce his sentence on May 21, 1976; shortly thereafter he began "cooperating" with the offices of the United States Attorneys for the Southern and Eastern Districts of New York. Accordingly, defense counsel requested the Court to defer consideration of defendant's application until the federal prosecutors had an opportunity to assess his cooperation and report to the Court. It is now before us with counsel urging us to place a high value on his client's disclosures, the true extent of which we evaluate later herein.

On November 26, 1976, the Government requested us by letter to delay decision on the instant motion inasmuch as an identical motion respecting the previous sentence (hereinabove mentioned) was pending before Judge Cannella. We now learn that Judge Cannella denied defendant's Rule 35 motion noting, "This defendant's record speaks for itself: he has had numerous brushes with the law and when he appeared for sentence before this Court, he had already been sentenced to a term of five years' imprisonment for dealing in cocaine." [*USA v. Roberto Rivera*, 74 Cr. 472, memorandum and order dated November 8, 1976, p. 2.]

Although Rivera pled guilty to the conspiracy count only, we must look elsewhere to determine the nature of the character of the individual with whom we deal; this search includes the substantive offense, its scope and the seriousness of defendant's involvement in the plot and its aftermath. From our study of vital information made available to us from authoritative sources, we are reasonably certain that Rivera was a customer of the core group of distributors, and that he in turn had his own distribution organization. Rivera quite clearly was no street junkie, rather a distributor of considerable magnitude. On the merits, we are compelled to apply to this defendant our remarks on December 3, 1975 when we imposed sentence on his co-conspirators:

> We have presided over trials involving the sale of substantial quantities of narcotics. Never, however, on a scale as extraordinary as this with its enormous quantities of heroin bought and sold on an almost daily basis. The activities of this group emphasize the overlords and regimental tiers of operation, all gov-

1. Subsequently, eight co-defendants went to trial (the others were fugitives); seven were found guilty on various counts; they were sentenced to terms of incarceration ranging from 8 to 40 years.

erned by tight maneuvers and bold enough to successfully avoid governmental detection of which they were constantly apprehensive and aware. Nor have the important operational details of their cruel enterprise come to light even at this late date.

Let's face it. So inhuman, ruthless and cold blooded was their approach to the execution of their nefarious schemes that we sat aghast at the unfolding of the enormity of their horrifying indifference to life's values.

The holocaust of misery, the dreadful terminus of life for legions following the vast narcotic operations revealed herein too horrifying even to contemplate. [*USA v. Magnano et al*, sentencing minutes at p. 52]

### Criminal profile

"Pretty much all law," wrote Justice Oliver Wendell Holmes, "consists in forbidding men to do some things they want to do." Crime is many-faceted and follows the form of the community. It is as normal and as abnormal as disease. But the public attitude and understanding of crime is about at the state that medicine was at the beginning of the 19th century. People still deny it in themselves, turn away from anyone accused or even suspected, are wilfully ignorant of its varieties or treatments, and prefer to believe it does not exist. And yet many daily toy with it in thought and operate along its border.

Crime is beginning to be understood as an aspect of man's mental-emotional-moral nature. This nature, assailed by many forces both within and without his bodily frame, is susceptible to many infections. Some are capable of destroying their victim, and more important still, of infecting others.

Every crime represents a point of fracture between the personality of the delinquent and the social equilibrium which he had created to meet his needs. Arrest demonstrates that the situation had become unsatisfactory, even intolerable, to society, or to the delinquent, or both. What has cracked up is the criminal's organization of social forces that provided what he wanted, at a price he was willing to pay. He now serves notice on us that payment of the "price" we exacted—the one we imposed vis-a-vis our sentence—is harsh and unbearable and that he has been unjustly denied a "credit" he insists he earned by sacrificial "cooperation" with the authorities.

A criminal court takes on the situation of a shattered career at a point where the wrong-doer has been forced to examine himself in the light of how his recipe for meeting life has succeeded. His predicament, brought on by arrest and subsequent court proceedings, produced severe shock. For one thing, he thrashes about with the nagging compulsion that his life solution has failed and he must inevitably repudiate it. At the point of its breaking down, he clings tenaciously to the notion that he cannot wholly renounce the way he has so lovingly built up; he resists facing the fact that it has failed. In all likelihood, the picture he had created of family as selfish and self-centered, his friends as sycophants and dead beats, and of himself as one denied and abandoned, was so poignant that in anger and self-pity he attempted moral suicide. He hoped they too would have to drink some of the cup he was about to drain.

### Cooperation with the authorities

Thus it comes to pass that a defendant, after conviction by plea or trial, must learn most unwillingly the sentence about to be imposed upon him. If confinement is his fate, how can he possibly lessen the tremendous force of its impact? He seeks consideration at the Court's hands for the "cooperation" he claims he has already extended the Government authorities or he proposes he be afforded an opportunity to do so. What of his "cooperation"? Is it valid or hollow? Is he motivated by a sincere and earnest desire to "come clean" or is he engaged in an artful maneuver cunningly advanced to gain "credit"? How do we assess this troublesome and aggravating issue of a defendant's cooperation? A scholarly interpretation of statute or code is

uncalled for here; instead the imperative is an understanding not only of who a defendant is but what he really was and what he has become. Mr. Justice Holmes reminded us (*The Common Law*, p. 1) that "The life of the law has not been logic: it has been experience." And as for the aggravation entailed, we have long faced up to the reality, as a former Chief Judge of this Circuit observed, that "criminal practice provide[s] fewer paying clients and more aggravation than any other field of law."

From such cooperating defendants a veritable cataract of disclosure gushes forth, saturated with sincerity and intensity; whereupon the shackles on justice fall away and the community indeed becomes the beneficiary. On the other hand, with many there is a guarded and hesitant "revelation," a bit of evidence here and there coupled with a long and fervent recital of material already well known to the prosecuting officials, as the defendant usually is fully aware. There are numerous instances where cunning outstrips intellect.

We have usually given credit to defendants who do cooperate, for such is clearly in the interests of justice. We inform defendants that if they decide to cooperate, "level with" the authorities, but only after consulting with their lawyers; otherwise, it might be best to remain silent.

In the present case, there appears to be a genuine issue as to the extent and value of defendant's cooperation. In such a situation, what course is open to the Court? Obviously, we cannot conduct a hearing to determine the worth of each piece of evidence defendant has supplied to the Government; that would be interminable, the evidence adduced exhausting. Such a review of all the material would place an enormous burden upon the Court.

### a.  *youthful offender*

What kinds of persons generally offer to cooperate with their prosecutor, the United States Attorney? For example, of one group it may be said that to the awesome day of sentence come many defendants whose surging thoughts include yearnings to renounce the worst parts of themselves. There are a great many cases in which the delinquent's conscience has been alerted and in which he is prepared, with encouragement, to reorient his entire moral structure. The recuperative forces are chiefly in their own nature. The first mark of repentance is desire to help repair the damage one has brought about. Because such repair is in itself perhaps the soundest type of education, judges are at some pains to assist defendants in the organization and carrying out of these forms of educational enterprises.

This group consists in the main of well-intentioned but heedless young people who have stumbled into disaster and are shocked with themselves as well as by their situation. They show a relatively high moral potential. Invariably their cooperation is full and complete; often their confession unhesitatingly offered involves them and their associates far beyond the scope of the charge that brought them before the Court.

Such offenders with good moral potential can be treated in the community—they are the "morally ambulatory" as it were. Their clinic is the court and its professional facilities including most importantly the probation department.

Let us look at youthful offenders in general and the prospect of obtaining their cooperation with the United States Attorney. Youthful crime is crime at the source. The youthful criminal may be self-infected, he has frequently been infected by another or he may have been conditioned by the mores of his gang or his neighborhood or even his family. He may even be so naive and unacquainted with morality as not to be aware of his entrance into the age of responsibility.

After all, the delinquent has defied the community. He is threatened both in depth and extent, and he is insecure of his own integrity. A delinquent is usually very well aware that he has made a mess of at least one situation, and he suspects of others. The botched situation once was rosy with promise. But he can't live in it any longer;

he must move on into another compelling dream. A famous Scotch divine once preached a very famous sermon entitled "The Expulsive Power of a New Affection." What the delinquent needs above all else is that "new affection." No one, least of all a disappointed delinquent, can desire forgiveness or crave "reinstatement" for more than a little while. What he wants is job status, a car, a sweetheart, wife, children, a house and garden. These dreams once lighted have a steady incandescence.

The slow learners form an important proportion of youthful offenders. The slowness of their learning is emotional and moral rather than intellectual. They are likely to admit their fault, often with little shame, and sometimes boastfully. They are more likely to attribute their arrest to luck, clumsiness, having been double-crossed, the failure of associates. They are not ready to repudiate the potential value which they saw in their offense as they planned it. Some will maintain stoutly that a theft not discovered or not punished scores high and is a solid advantage. The community is their authority for this judgment. They have heard that half of the reported crimes go unpunished and that less than 10% of crimes are reported. They are likely to have an extensive stock of instances of skulduggery perpetrated by the community's "most eminent" citizens. They have no illusions about adults, including judges and probation officials. They fear official power, but do not respect the source of that power nor the officers.

The community's attitude towards youthful offenders, like its treatment of youth generally, is a mixture of softheartedness, exasperation, wounded resignation and sadistic pleasure in punishment. Nowhere is the common failing of acting first and thinking afterwards more evident than in our handling of the social significance of youth crimes, that is, of how this transitional state between childhood and young manhood is being bridged. No responsible authority operates in this field. Once a complaint is issued against the young offender the good forces about him shrink and evil forces are alerted. Those he has injured are outraged, the parents of susceptible children become fearful, the godly draw their garments around them, the evil-minded anxious for social support welcome a convert, the police close in on a quarry.

These problems, these situations, this plea are succinctly summed up in two brief comments by two observers. They require no amplification. They constitute the challenge to all citizens who care. The first is contemporary testimony by a 19 year old city boy:

> Guys who don't feel like they're countin', who are being shoved around, who feel like they are worthless to everybody, well, they're the guys who go out and try to make names for themselves by being big stick-up guys. It's on account of they feel like they are nobody.

The other, by one of the greatest jurists of our land, former Associate Justice Benjamin N. Cardozo of the Supreme Court of the United States:

> Run your eyes over the life history of a man sentenced to the chair. There, spread before you in all its inevitable sequency, is a story of the rake's progress more implacable than any that was ever painted by a Hogarth. The Correctional School, the Reformatory, Sing Sing, or Dannemora, and then at last the chair. The heavy hand of doom was on his head from the beginning. The sin, in truth, is ours—the sin of a penal system that leaves the victim to his fate *when the course that he is going is written down so plainly*. . . . (emphasis added.)

Repeatedly we have witnessed the majority of this group of offenders, only when painstakingly approached, come forward and cooperate without reservation.

### b. *repeat offender*

Cooperation with Government authorities does not come so easily from another group of youthful delinquents. They have been so disadvantaged and hard driven by temperament, family, neighborhood and community pressures that, set against their life situations the criminal charge lacks major im-

portance. Where there is so much deep-seated misery, one additional increment does not seem to matter too much to them.

Since the day of Cain and Abel, the juvenile offender has been with us. The biochemistry of youth is keyed to lust, violence, acquisitiveness, tempestuous and ill-considered action. Among the costs of carrying youth over the decade of transition from childhood into the beginning of responsible maturity is an incalculable mass of material and social wreckage—damaged and wrecked family cars, increased insurance rates, wanton destruction of household, commercial and community property, medical bills growing out of carelessness and foolhardy exploits, irresponsible pregnancies and births. Families, relatives, friends, neighbors absorb a major share of these costs. This situation is age old and the community, in effect, has adapted itself. Crime is that one-eighth of the iceberg of human cussedness whose ravages are put down and added up in police and court records.

After all, youth offenses are the bud stage of criminality. They follow in the main patterns of adult desires, but they are less cerebral, less variegated and most lusty.

Sentencing the offense rather than the person plunges this group of young offenders headlong into hatred, revolt, community-repudiation—into something approaching self-destruction. Society then has lost a son and gained a wastrel whose depredations have been known to affect the lives of many and to cost billions.

Such persons must be handled with great skill, care and patience, and in order to prevent reinfection on release a truly therapeutic and curative supervision is imperative. The issue is what the moral typhoid carrier will do in the community on his release. Yet, by the exercise of the same great skill, care and patience, most of them can be won over to the point where their cooperation, hesitantly indicated at first, becomes reliably helpful.

### c. *hardened offender*

What of cooperation by the determined offender, the ruthless operator, the felon with an extensive criminal record? Can that be genuinely realized? Emphatically yes and quite often. Of course, the prosecutor urging cooperation must be prepared to participate in recriminations and discouragements, in false starts, failures, hard ascents and periods of slow gain. In the appropriate case, we tell a defendant frankly that if he decides (after consultation with his attorney) to cooperate, we must look to the Government for a fair estimate of the true extent of his cooperation. The day of sentence can be pathogenic. For years after the defendant may relive the throbbing event in his life, discover new flaws, bitterly blame those he believes responsible for his sad plight and take on a new, deep-seated lament, resentment and hatred. We have learned much, over decades of judicial work, from defendants we placed on probation, suspended sentence, or committed for short or severe terms of imprisonment. Our principal learning has come from extensive and intensive conferences in chambers with defendants, their attorneys, prosecutors, probation officers, men of medicine, etc.

The determined offender against "the peace and dignity of the people" presents a challenge not to be evaded. The right to move safe and unmolested through the city, to be secure at work and at home, to be protected against frauds and schemers, is the supreme luxury of civilization. For it the community pays a huge price, and is intolerant of failure or lag on the part of its agents and instruments. It cannot be patient with or concerned about the welfare of offenders while they threaten its security and comfort. They are the crafty professionals, whose aim is to bleed the community's resources for their own pleasures, using the instruments of the law itself in carrying out and safeguarding their operations and personal safety.

When he confesses ("opens up") to the United States Attorney, the extent of his depredations and that of his numerous partners in crime, the deeply imbedded tenta-

cles of their operations may be cut so irreparably as to bring to a halt their illicit operations. Usually he cunningly seeks to secure a commitment from the prosecutor (he tries desperately for a promised bargain) that in return for his cooperation he will receive a lenient sentence; he finds it not forthcoming; that the most he can expect is the prosecutor's promise, provided the cooperation stands up under close scrutiny, to recite the extent and value of the confession to the judge on the day of sentence which, it is emphasized, may be adopted or rejected in whole or in part. It is beyond cavil that the determined offender's cooperation, if found genuine, is the most important of its kind and may produce results of inestimable value and go far in reducing the totality of community apprehension, a result with which, of course, he has absolutely no concern.

By confessing, the determined offender often has much to lose—not infrequently, for example, assassination at the hands of former partners in crime. While on occasion throughout our four decades of judicial life we have taken into consideration on sentence a defendant's baseless refusal to cooperate,[2] we recognize that in most instances a defendant should not be penalized for his decision not to cooperate, for that decision most often is a uniquely personal one and is often based upon valid considerations of personal and family safety and other factors known and unknown to the Court. Usually the defendant alone is in the best position to determine the hazards of cooperation and it would be unthinkable for us to interfere.

It has been our experience that usually the cooperation of the determined offender has been substantial and beneficial to community well-being and we have responded by severely cutting into the length of a prison sentence which otherwise would have been his fate. In doing so, however, it is the judge who, in final analysis, must determine the true worth of the disclosure; his fact-finding ability, so often invoked at trials to the court, etc. and ending in the rendition by him of judgment, does not become · quiescent on such an occasion. Consequently, in assessing a defendant's cooperation, we must depend on the Government, in large part, to report on its quality. The Court was not present when defendant talked with the prosecutors, nor are we as familiar with the facts as the United States Attorney's Office. Similarly, we have come to rely on the Probation Department for its independent assessment of defendant's cooperation. Then too we cannot be expected to conduct an independent inquiry to evaluate its reports. As officers of the Court, the prosecutors and probation officers have a sworn obligation to effectuate the interests of justice; that alone provides a significant basis upon which we have come to rely in our judgment.

### The challenge in this case

How well has this defendant now before us really done? The Government (Assistant U. S. Attorney Dominic F. Amorosa of this district) wrote the Court (copy to defense counsel) detailing the extent of Rivera's purported cooperation: "Although Rivera did supply us with accurate information with respect to someone then under indictment, testified in the grand jury with respect to this defendant and agreed to testify at this defendant's trial (he pled guilty), Rivera's cooperation was generally an effort to deceive the Government in the hope that the Government would make a favorable report to Your Honor . . . with respect to his cooperation."

He concluded: "It is thus our position that Rivera's proposal to cooperate was not made in good faith and that the information he provided us with was in large part nothing but misrepresentations and that he has withheld and refused to disclose information which would be extremely important to us in our efforts to prosecute large narcotics violators. We are consequently

**2.** *U.S.A. v. Sweig*, 454 F.2d 181 (2d Cir.1972); *U.S.A. v. Vermeulen*, 436 F.2d 72 (2d Cir.1970); *U.S.A. v. Sclafani*, 487 F.2d 245 (2d Cir.1973).

compelled to oppose Rivera's motion to reduce his sentence."

Counsel for defense replied by letter (no indication of copy to Government) that he was compelled to correct "an unfair impression" conveyed by the prosecutor's letter, and urged that defendant cooperated with the United States Attorney's Office in the Eastern District and "gave them all the information that he knew," which cooperation, counsel stressed, would be confirmed by letter. Counsel's explanation for defendant's apparent lack of cooperation with the Southern District authorities was that they sought information concerning one Jacqueline Morgan, who, aside from being an allegedly notorious drug dealer, was also defendant's common law wife and mother of his child. He concluded, "Mr. Rivera would not testify or cooperate in matters which would place his child's security and happiness in jeopardy but did cooperate in other matters does deserve . . . our respect and consideration."

Subsequently, we received a letter from Assistant U. S. Attorney Schlam respecting defendant's cooperation with the U. S. Attorney's Office, Eastern District, and he concluded: "Although we finally decided not to call Mr. Rivera as a witness because we believed his testimony would have been cumulative, it was our impression that he was candid with us about his knowledge of police corruption."

We find that defendant's cooperation is not sufficient, in light of the facts of his crime and his background, to warrant reduction of sentence. We are simply not convinced that defendant "opened up" to the prosecutors, especially here in the Southern District.

We are similarly unpersuaded by the letters respecting defendant's positive adjustment to prison life. Warden Taylor of the Metropolitan Correctional Center here in Manhattan, as well as other employees of that facility, have written complimentary letters on defendant's behalf regarding his cooperation and efficiency in completing assigned tasks. While these letters are encouraging (and should prove helpful to the Parole Board at the appropriate time), we must not lose sight of the rights of the community which rightfully insists on effective punishment for heinous crimes such as this.

*Conclusion*

As hereinabove set out, this defendant has shown by his involvement in this and other cases a day-to-day operation over many years in the course of narcotics dealing substantial in the extreme and highly detrimental to the community. The quantities involved clearly demonstrate he was, by his own admission, an active participant in a massive heroin selling conspiracy.

We repeat: "sentence is addressed not only to the crimes of which [defendant] stands convicted, but to his behavior pattern as a human being over a substantial period of time." *USA v. Magnano*, sentencing minutes at p. 55.

We still regard the sentence herein imposed fair to defendant and community alike. We find his alleged "cooperation" hollow and unworthy. Our sentence stands. Accordingly, defendant's motion to reduce it is denied in its entirety.

SO ORDERED.