**UNITED STATES of America**

**v.**

**Antonio J. RANNAZZISI, Defendant.**

**No. S 76 Cr. 1031.**

United States District Court,
S. D. New York.

July 21, 1977.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for United States; Lawrence Iason, Asst. U. S. Atty., New York City, of counsel.

C. John Prince, Jamaica, N. Y., for defendant.

IRVING BEN COOPER, District Judge.

By his plea of guilty before us, entered of record on March 8, 1977, the defendant stands convicted of illegally accepting money from dealers in meat whose premises he inspected while a sworn official of the United States Department of Agriculture. We imposed a sentence of eighteen (18) months on May 11, 1977. He now brings on a motion to reduce that sentence pursuant to the provisions of Rule 35, Federal Rules of Criminal Procedure. In his sworn statement (15 pages unnumbered, hand-written printed letters, sworn to on May 31, 1977) in support of his application, he urges upon us (1) the hardship that the sentence has brought his family; (2) that it will prevent his attendance at the forthcoming wedding of his daughter in early next September; (3) that mortgage payments and other indebtednesses cannot be met unless he is in a position to earn money and (4) that he cooperated with the office of the United States Attorney in its endeavor to learn the full extent of the culpability of other meat inspectors and meat packers constantly engaged in the nefarious practice of what in essence amounts to bribe giving and bribe taking between the two.

The criminal information herein is precise and succinct. By his plea of guilty thereto, defendant admits that he "unlawfully, willfully and knowingly . . . directly and indirectly, did ask, demand, exact, . . . accept, receive . . . money . . . for himself for and because of official acts performed and to be performed by him" from five (5) meat packing companies (listed therein) engaged in interstate commerce and inspected by inspectors of the Department of Agriculture authorized to perform the duties required by the Federal Meat Inspection Act of 1967 (Title I of the Wholesome Meat Act) including the inspection of establishments where meat and meat food products are processed; that as such inspector, defendant at various times during the period February 19, 1974 to July 15, 1975 accepted sums of money from those five companies in direct violation of law. Title 18 United States Code, Section 201(g).

■ The criminal information was filed after a grand jury had returned an indictment (filed November 9, 1976) against this defendant charging him in five (5) felony counts with "unlawfully, willfully and knowingly did receive and accept money from" each of the same five companies while he was an inspector assigned to inspect their premises. The Government elected to proceed by way of information (embodying in essence the charges of the indictment) and on motion duly made, and after the guilty plea to the information was entered and recorded, the indictment was ordered dismissed. All this we had a right to consider on sentence. See, e. g., *U. S. A. v. Sweig,* 454 F.2d 181 (2d Cir. 1972).

In its investigating net, the Government in this district caught 16 inspectors (including this defendant) engaged in practices similar to those followed by defendant, and 21 corporations which paid the money to the inspectors; criminal charges were filed against each; all such cases (received by us on November 22, 1976) came on and were disposed of by us; 12 inspectors pleaded guilty, 3 were convicted after trial[1]; each company pleaded guilty to the charge of illegally supplementing the salary of a public official, 18 U.S.C. § 209. Sentence has already been meted out as against each individual and each corporate defendant.

During the course of its investigation into the illegal actions by the meat inspectors and the meat packers, the Government found itself blocked in its efforts to marshal evidence that would warrant convictions by plea or trial; it felt constrained to and did grant immunity to the corporate officials of the corporate defendants who actually helped carry on the illegal operations with the inspectors. While such immunization

---

1. The charge against one defendant was dropped after his conviction and sentence on a similar charge in the Eastern District.

must be carefully invoked and only when no other course is open, the law countenances the practice, for as between the bribe giver, a private person or company, and the bribe taker, the public official who violates his trust to the detriment of the public and its government is the more (not much more) reprehensible. *U. S. A. v. Murphy,* 480 F.2d 256, 259 (1st Cir. 1973).

Defendant (now age 54, with no prior criminal record) began his work as a government inspector in 1966. In that capacity he had relatively speaking enormous power; he could shut down a company's entire operation if he determined (fairly or not) that a regulation had been violated (even of a technical nature). The extent of defendant's duplicity in these abhorrent operations makes him stand out as the most culpable of the lot. From what we have seen, heard or had good reason to rely upon, we are satisfied that defendant discussed such payments made by packers, the rate of payment, who was accepting and which companies were paying; that on occasion defendant threatened to close a meat plant's operation if money was not paid. And at sentence we told him so: "You held up the meat packers . . . very bold. You were tough. You were base . . . They [the companies] did their best to keep the thing going . . . They capitulated to you." Sentencing minutes, pp. 83, 84, 86. It should be observed that before sentencing Assistant United States Attorney Iason (in charge of all these "meat cases") stated in writing, served on defendant's attorney and filed with the Court, that he stood ready to call witnesses to support the manner and extent of defendant's exactions if the defendant "challenges its accuracy and if the Court believes a hearing would assist the Court." Suffice it to say that neither defendant nor his attorney chose to put in issue the accuracy of the Government's sentencing memorandum and neither requested a hearing.

This imperative provision of law was purposely designed to prevent the awesome results that would follow if unsanitary meat were pushed on the public. It is inevitable that the giving and taking of anything of value as between the inspector and the inspected would be disastrous: it would prompt the former to be careless and indifferent to the full and proper performance of his duties—tend to cause him to "look away." Then the irreparable damage is done. This clear and inescapable provision of law is drilled into each inspector on the assumption of his sworn duties; it is clearly set out in the handbook (the "bible" of the department) issued to him by his superiors of the Department of Agriculture; he is aware that, as far as possible, the Department is on the lookout for such infractions. If he is inclined to ignore it, the inspector takes the risk that his depredations will not be discovered primarily because such deportment is not easily recognized (checking for venality of public officials is usually done by a minimum of personnel in this and most governmental operations) and because the equally debased meat packer is likewise involved and therefore can be counted on to keep silent. Thus the dirty business went on for years. It is to be observed to their shame and to the detriment of the commonweal that not a single meat packer (many doing a gross business running into tens of millions of dollars yearly) took overt, tangible action to alert the authorities; a few were subjected to demands from inspectors (this defendant for one), most were *particeps criminis.*

We need not look far to discover defendant's evaluation of the prohibition in question. In the first place, he acknowledges in his sworn statement in the instant motion (p. 4) that "I did receive gratuities from some, and that the sums I received where [sic] less than the amounts the plants mentioned." And here we finally have it (in the same sworn statement at p. 9): "I felt I did nothing wrong: As I did not ask for anything and that if anybody handed me anything, I took as I was brought at a time when people hand you anything you would be a damn fool to refuse it."

To such a one what meaning is the observation by Mr. Justice Brandeis proclaimed almost half a century ago (*Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the laws scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. We ignore the learned Justice's plea at our peril.

We come now to the hardship defendant avers his sentence has brought upon his family consisting of wife and three children. It is only fair and proper to note that he seemingly has always worked to support his family whose sense of good deportment appears high. We are all too well aware that here, as in most cases, the aftermath of sentence falls heavier on the family than on the wrongdoer. We have witnessed and been saddened by the knowledge of it time and again during the course of nearly four decades as a judge. We feel compelled to take notice of, and make allowance for, it even though it almost invariably is the convicted offender, not the Court, who brings upon his family the dreadful results which ensue, so often devastating even beyond recall. It was this defendant's choice to make; he really has only himself to blame.

We make bold to comment that trial judges with whom we have conferred over the years of judicial service, join in our observation that imposing sentence is the most difficult of judicial undertakings; that usually the judge is more sorrowfully affected by the sentence he imposes than either the defendant or his counsel. After all, we are compelled to keep uppermost in mind that justice due the accused is due the accuser also and that the after effects of a sentence, like every important judicial determination throughout the entire proceedings, affects defendants and community alike. We are constantly reminded and face up to the unfailing force of the observation made years ago by a former Chief Judge of this Circuit: "criminal practice provide[s] fewer paying clients and more aggravation than any other field of law."

We do not look with indifference upon so much of affiant's sworn statement which deals with the forthcoming marriage of his daughter. In this connection we give considerable weight to an impressive and moving letter received from his wife who, despite a physical handicap for many years, has worked not only in the home but outside in order to help defray living expenses. In it she tells us of the understandable shock to herself, family and friends if her husband is absent from the ceremony. A compelling letter from the daughter also carries great weight with us. Based on the information imparted to us from sources other than defendant, we do not believe he indulges in hyperbole when, in his sworn statement, he alleges that his daughter "is considering of cancelling her forthcoming marriage, because her father won't be there to attend the fatherly duties of the marriage ceremony, and to join in the festive proceedings on the most joyous day of her life . . . not having the honor of giving our first child in marriage together . . . hurts more than I can describe." (pp. 1, 14) With the full cooperation (on which we can rely) of the Warden at a western centre, in whose custody defendant is presently, we shall arrange for defendant's attendance at the wedding, allowing sufficient time (4 days) for transportation and family visitation before and after the event. This we are prompted to do primarily in response to the desperate plea the family invokes.

A substantial portion of defendant's sworn statement relates to his alleged cooperation with the office of the United States Attorney. We have had occasion quite recently to deal with the subject of a defendant's cooperation with the authorities, the types of persons involved therein and the consequences to defendants and com-

munity.[2] For purposes of this opinion, we merely observe that a criminal court takes on the situation of a shattered career at a point where the wrong-doer has been forced to examine himself in the light of how his recipe for meeting life has succeeded. His predicament, brought on by arrest and subsequent court proceedings, produces severe shock.

It often comes to pass that a defendant, after conviction by plea or trial, must learn most unwillingly the sentence about to be imposed upon him. If confinement is his fate, how can he possibly lessen the tremendous force of its impact? He seeks consideration at the Court's hands for the "cooperation" he claims he has already extended the Government authorities or he proposes he be afforded an opportunity to do so. What of his "cooperation"? Is it valid or hollow? Is he motivated by a sincere and earnest desire to "come clean" or is he engaged in an artful maneuver cunningly advanced to gain "credit"? How do we assess this troublesome and aggravating issue of a defendant's cooperation? A scholarly interpretation of statute or code is uncalled for here; instead the imperative is an understanding not only of who a defendant is but what he really was and what he has become. Mr. Justice Holmes reminded us (*The Common Law* p. 1) that "The life of the law has not been logic: it has been experience."

From some cooperating defendants a veritable cataract of disclosure gushes forth, saturated with sincerity and intensity; whereupon the shackles on justice fall away and the community indeed becomes the beneficiary. On the other hand, with many there is a guarded and hesitant "revelation," a bit of evidence here and there coupled with a long and fervent recital of material already well known to the prosecuting officials, as the defendant usually is fully aware. There are numerous instances where cunning outstrips intellect.

Defendant would have us believe that, on the advice of his lawyer, he twice presented himself before sentence at the office of Assistant United States Attorney Iason in an endeavor to voluntarily assist the Government in its investigation of the unholy alliance between inspectors and meat packing plants. It is overwhelmingly clear that he revealed absolutely nothing of value. His own sworn statement demonstrates that on the first occasion he falsified; the second interview was a hollow performance indeed. It was then and there he learned the Government's estimate of his machinations, based on the totality of the evidence gathered by that office: that defendant demanded money from the companies he was assigned to inspect; that "even when he was given money, he often demanded more and retaliated if his demands were not met. This retaliation took the form of closing all or part of a plant. Once his demands were met, the harassment stopped." (repeated in Government's Sentencing Memorandum, p. 8) It was to be expected that this defendant would deny complicity, but his own version (in his sworn statement) of what took place at Mr. Iason's office defies belief. Asked what he talked about with his fellow inspectors (we must bear in mind he began his duties in 1966) he tells us he responded: "The family, weather, sports, condition of the duty's we have, and maintenance and sanitation problems how to solve them." Mr. Iason: "And you tell me you never say 'Joe Blow doesn't want to pay this week.'" "That's right when they start talking that way or I feel the conversation is leading into a discussion of that sort I walk away . . . I was brought up at a time and manner, that what you don't see or hear you can't talk about." (pp. 7, 8) What we do find credible is defendant's statement (p. 4) in his undated letter to our probation department: "When you do something wrong, even though you regret it, you cannot take it back."

The hollowness of defendant's "cooperation" is established by an episode in the courtroom. On the day his guilty plea was taken (March 8, 1977), with his attorney and Mr. Iason present, his attorney mentioned

---

**2.** *U. S. A. v. Rivera,* 434 F.Supp. 486, opinion filed July 7, 1977.

the defendant's desire to cooperate. We thereupon adjourned to the robing room where, with the official court reporter present, we learned that the two occasions defendant appeared at Mr. Iason's office amounted to a complete waste of time. In unmistakable terms, we placed on record our position under all the circumstances then prevailing: that such cooperation should take place only if defendant and his attorney believed he genuinely desired to do so truthfully; that we would not (and subsequently did not) add to his sentence if he decided against cooperating (the Court is empowered to do so. See, e. g., *U. S. A. v. Sweig,* 454 F.2d 181 (2d Cir. 1972)); that if defendant decided to cooperate, we would have to rely to a large extent on the Government's estimate of defendant's cooperation; that if we were satisfied on that score, the sentence (to take place on May 11, 1977) would reflect it. Mr. Iason then offered to make himself available to defendant and his attorney. To assure defendant of our belief in and reliance on Mr. Iason, we added: "He is very meticulous, extremely thorough and forthright. He will give credit where he thinks credit is due." Minutes, pp. 2, 4, 8, 9, 10. All this proved another waste of time, for since that day to this neither defendant nor his lawyer contacted Mr. Iason.

In his sworn statement defendant expresses his unalterable belief that to a large extent Mr. Iason is responsible for his predicament: "I believe that I was singled out because of a clash of personalities between Mr. Iason and myself." (p. 14) Nothing can be further from the truth. At all times we have found Assistant United States Attorney Iason extremely conscientious, firmly devoted to the exacting demands of his calling and, equally important, positively fair. That type of prosecutor is unlikely to win accolades from defendants called to account for their criminal activities.

Defendant's bitterness also is directed to the Court. At first he puts it this way (p. 1

of his affidavit): "Knowing that you have to give just punishment to crimes committed. It is your duty to do so." But on p. 15 we find this: I don't believe that I got equal justice . . . the Court when it sentenced me did not give me equal justice . . . similar acts done by my fellow inspectors and their sentence was far less in severity." It is evident that neither defendant nor his lawyer know what factors enter into the pronouncement of sentence.[3] Firstly, we imposed a more severe sentence in the case of another inspector in this group. *U. S. v. Gubelman,* (May 11, 1977) Secondly, as we said in *U. S. v. Magnano,* 2 Cir., 543 F.2d 431 (sentencing minutes of December 3, 1975 at p. 55): "sentence is addressed not only to the crimes of which a [defendant] stands convicted, but to his behavior pattern as a human being over a substantial period of time." Thirdly, we measure as best we can the depths of iniquity to which a defendant has sunk while pursuing his illegal objectives. This defendant was outstanding in that regard.

Also, the vast majority of defendants in these "meat cases" pleaded guilty but their infractions were far less severe, they were contrite, many truly cooperated, most "took" but did not demand or threaten. Although defendant does not choose to recognize it, he is most fortunate indeed that he was not tried on the indictment (filed November 9, 1976); in all likelihood he would have been found guilty of most, if not all, of the five felony counts and sentenced to a far more extensive prison term (we can sentence only on the criminal charge before us).

We have delved quite deeply into the problems facing this defendant's family. With additional new information recently received, our favorable impression of the family's uprightness, as hereinabove mentioned, is reinforced. The wife, long suffering from a physical handicap, has been in a state of severe depression since her hus-

---

**3.** In a case involving a similar charge (*U. S. v. Gubelman,* tried April, 1977) one of the "meat cases," the same attorney, on a motion there too to reduce sentence, made this irresponsible statement in his affidavit: "the defendant was punished so severely because he may have the temerity to face up to trial, instead of pleading guilty as the other inspectors did. . . ."

band's arrest. Her treating physicians regard her present physical condition as quite serious requiring frequent tests and observation. The other members of the family, seemingly of good character and industrious, are striving to put things in order; they are quite overwhelmed by the sudden onslaught of worrisome problems which has so suddenly enveloped them. The defendant brought about all this grief by his illegal deportment, not in one or even a few instances but continuously over a period of years—scores of illegal bribes each one actually constituting an infraction of law. We are constrained to and do find his application to reduce sentence totally without merit and accordingly deny it in all respects.

Based exclusively on our independent study of the family here involved, and the almost disastrous effects on them of the sentence imposed, we regard it only meet and proper, on the Court's own motion, to reduce the sentence to one year.

SO ORDERED.