**UNITED STATES of America,**

v.

**Leslie W. BEASLEY, Defendant.**

**No. 79 Cr. 761 (IBC).**

United States District Court,
S. D. New York.

May 21, 1980.

 

William M. Tendy, U. S. Atty., Southern District of New York, New York City, for United States of America; Stuart Jay Baskin, Asst. U. S. Atty., New York City, of counsel.

Geller & Cohen, New York City, for defendant; Irving Cohen, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

This plea for reduction of sentence has induced us to comment at length, having given close scrutiny to every detail in the case from its inception up to and including the sentence of three years imprisonment we imposed on December 6, 1979 after the defendant entered a plea of guilty to a felony charge that he and his two co-defendants "[o]n or about the 24th day of May, 1979, in the Southern District of New York, . . . unlawfully, intentionally and knowingly did distribute and possess with intent to distribute a Schedule II narcotic drug controlled substance, to wit 134 grams (net weight) of cocaine and dilutants. (Title 21 United States Code, Sections 812, 841(a)(1), 841(b)(1)(a) [sic] and Title 18, United States Code, Section 2.)"

We have refrained from making a full disclosure here of the defendant's activities since he attained maturity (he is presently 39 years old), because we are resolved not to inflict additional harm on his family and friends—a result that would be bound to ensue inasmuch as this opinion must be officially filed, thereby becoming a public document. Suffice it to say that the defendant has been, so far in his life, the beneficiary of extraordinary good fortune. He was reared by parents highly regarded in the community and distinguished in their vital professional field; he has siblings who have given a good account of themselves; and influential friends who trusted and encouraged him along the way.

While the defendant has no prior criminal record, a study of his deportment over the

past decade alone reveals a person long engaged in activities not in the least to his credit. These he kept hidden behind a good mind, a pleasing personality and an ability to perform creditably in his undertakings above the normal. In point is the estimate of his attorney: "[The defendant has] an ingratiating and caring personality, [he] never had difficulty in winning over people. He is kind, considerate and charming. But that is only the exterior. Within him is an insecure individual . . . . Uncertain he could actually succeed he took the easy way out by finding ways, even subconsciously, not to follow through." Affidavit of Irving Cohen, Esq., verified March 27, 1980, at 2-3 [hereinafter cited as Cohen affidavit].

\* \* \* \* \* \*

Our desire not to inflict further travail upon defendant prompts us to avoid certain details which affect our decision on his motion for reduction of sentence. However, we are compelled to indicate certain factors brought to our attention which we cannot minimize or disregard. He and his counsel know to what we refer when we indicate our consideration of the circumstances surrounding his arrests in 1969 and 1972, the criminal charges in each of which were subsequently dismissed; his statement to the United States Customs Agents in 1969; the resulting episode with the New York City police department in 1973; the subsequent outcome of his employment by an important governmental agency of New York City; his failure to reveal his attendance at educational institutions outside of this State, when disclosure would have been proper; his "approach" after arrest to one of his co-defendants who planned cooperation with the Government in the present case; his efforts to obtain payment from a co-defendant for the cocaine seized prior to completion of the second drug transaction; his explanation of the $2,280 in cash on his person at the time of his arrest; his admis-

sion that he supplied the seized four ounces of cocaine "merely acting as a middleman" and his explanation as to the ultimate recipient of that cocaine. None of these items are even mentioned in the papers before us on the present application.

Our complete examination prompts us to regard as justified the final estimate of defendant by the United States Probation Officer after the completion of his investigation of the defendant: "[H]e impresses as an intelligent, articulate individual who attempted to appear cooperative although he omitted some relevant information, was reticent about providing some more and was misleading in other areas."

\* \* \* \* \* \*

Defense counsel appears to take the position that the absence of a prior criminal record, true as to this defendant, is an open sesame to a lenient sentence; as if deficiencies of moral character reveal themselves only through the vehicle of a prior criminal record. We have with great frequency "taken a chance" on defendants who had a prior criminal record (sometimes quite extensive) where the life history of the offender demonstrated positive strength on which we could rely; seldom have they "let us down." In fact, their rehabilitation often is most encouraging, at times exciting. Indeed, we do believe (along with movant's counsel) in "the possibility that human beings . . . can change." Cohen Affidavit at 8.

This court has had more than a nodding acquaintance with persons convicted of crime (whether by plea or verdict), the effects of different types of sentences imposed, the utilization of concepts of rehabilitation, etc., etc.[1] During four decades of judicial service, we have tirelessly fought for the application of extreme care and sensitive understanding to each sentence imposed. It must be recognized that

---

1. *See, e. g., United States v. Ochs*, 490 F.Supp. 1206, No. 77-775 (S.D.N.Y. March 8, 1980); *United States v. Poynter*, 489 F.Supp. 604, (S.D.N.Y. 1980); *United States v. Cachoian*, 440 F.Supp. 39 (S.D.N.Y.1977); *United States v. Soldano*, 437 F.Supp. 85 (S.D.N.Y.1977); *United States v. Rannazzisi*, 434 F.Supp. 619 (S.D.N.Y.1977); *United States v. Rivera*, 434 F.Supp. 486 (S.D.N.Y.1977); *United States v. Unterman*, 422 F.Supp. 228 (S.D.N.Y.1976).

Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine. . . . We are born with predispositions. . . . Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference. . . . Impartiality is not gullibility. Disinterestedness does not mean child-like innocence.

*In re Linahan, Inc.*, 138 F.2d 650, 651–54 (2d Cir. 1943).

We find further such comment in *Skidmore v. Baltimore and O.R. Co.*, 167 F.2d 54, 63 (2d Cir. 1948):

> (Lord Bramwell observed, "One third of a judge is a common law juror if you get beneath his ermine"; and Mr. Justice Riddell added that "the other two thirds may not be far different.")

■ As we so often find true, a thorough inquiry into the character of a defendant without a prior criminal record proves most revealing and points the proper way at the time of sentence. The law endorses and encourages it. Under the much-cited United States Supreme Court case of *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the consideration of out-of-court information is deemed necessary to the sentencing process. To aid the judge in the exercise of this discretion, the judge is allowed *"to consider information about the convicted person's past life, health, habits, conduct, and mental and moral propensities."* (emphasis supplied) *Id.* at 245, 69 S.Ct. at 1082.

> His [the judge's] task . . . is to determine the type and extent of punishment after the issue of guilt has been determined. *Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent informa-*

*tion by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.* (emphasis supplied)

*Id.* at 247, 69 S.Ct. at 1083.

■ As we see it, this disposes of defense counsel's reference to the "disparity in the sentences" meted out to defendant and his two co-defendants: Beasley received three (3) years imprisonment and a five-year special parole period, his co-defendants, probation under the Youth Corrections Act. The answer is simple: We do not sentence the act committed; we sentence the whole person, taking into consideration the many factors we attempt to delineate herein. Put another and more effective way, "the punishment should fit the offender and not merely the crime. . . . The belief no longer prevails that *every offense in a like legal category* calls for an identical punishment without regard to the past life and habits of a particular offender." *Williams v. New York, supra*, at 247, 69 S.Ct. at 1083. (emphasis supplied)

\* \* \* \* \* \*

When we contemplate the sad and costly results that ultimately follow sentences imposed only after a narrow, limited inquiry into the background of a defendant, whether convicted by plea or jury verdict, it becomes clear that the sentence was imposed "in the blind." Failure to analyze and deal with factors relating to character, before imposing sentence, is akin to the surgeon making a crucial incision without prior examination of x-rays, medical tests, etc. What we really are doing then is predicating the sentence on the crime without knowing much, if anything, of the human being who committed it. The devastating results that follow are inevitable when the course a defendant will take is completely unknown.

The claim that it is too costly to properly investigate should not be considered; the future price that must be paid when there is inadequate preparation for sentence is quite commonplace—mishandling, improper treatment, mangled lives, delayed recuperation (or none at all)—multiplies many times

what the initial outlay would involve. In case after case, we find that the failure to properly examine into reliable character background at the time of sentence, proves enormously disadvantageous to defendants and community alike. We behold the result: warped lives and recidivism seemingly without end.

This court has frequently observed that a determined inquiry into all aspects of a defendant's background will bring to the sentencing judge valuable information relating to the offender's character which far exceeds what might be gleaned from the bare listing of a prior criminal record. Quite often illegal acts are committed and confessed by offenders who managed to escape detection and arrest at the time, and so the episode is unrecorded; at other times, the recording of a prior criminal conviction tells only half the story of an offender's nefarious practices. If we are to take the full measure of the person facing sentence, the intelligent search for reliable information concerning his character must go on; penetrate beyond superficial appearances.

The inquiry into this defendant's character compels the conclusion that he did not "come clean" with those whose assistance and cooperation he sought for his personal advance in life. We entertain little doubt that this failure to disclose entered into many of his dealings with those who placed trust in him and relied on his word; we believe that had he openly revealed the truth about himself, he would have been denied the benefits he ultimately secured in his various dealings. It is not surprising therefore that his inability to speak the full truth, which evidently has become an ingrained habit, recurred in his interview with his probation officer whose report to the Court defendant well knew would eventually be studied by us before sentence was imposed. That report reveals "half truths," failure to make disclosures defendant knew might place him in an unfavorable light; as well as outright falsifications and spurious explanations of vital facts, e. g., his expla-

nation of the source of the $2,280 on his person when arrested in the instant case ($2,200 was the purchase price of one ounce of cocaine provided by the defendants).

\* \* \* \* \* \*

The defendant's letter (April 4, 1980) to us, considered on this application, includes: "I feel that I have disappointed all the people who have had faith in me, my parents, teachers, and friends . . . .. [A]t the time of my arrest I was embarking on a career in which I was beginning to establish a good reputation. . . . I am not unmindful of my past transgressions."

In his moving papers, particularly his letter to us, the defendant assures us he has learned his lesson and is now ready to face up to life's challenges in an honorable way and that he will never depart from a high standard of good moral conduct. This pledge comes from one who has the greatest interest in the outcome of the instant application. The proof is far from adequate. We do not say that the defendant does not mean it; we simply are not certain the change he alleges has factually occurred. He may be experiencing a reaction which arises quite commonly from confinement: a ceaseless chafing that comes from a strict restraint on liberty which, like most of us, he took for granted and hardly gave it thought. Pledges of this nature also frequently come at the time of allocution at sentencing: the defendant in a moving appeal expresses contrition, asks for forgiveness, and pronounces his conviction that crime does not pay and that he is fully prepared to lead an upright life. Doubtless, he means it at the time he declares himself, but more often than not, sooner or later, he cannot resist the urge to resume those old values and practices which enmeshed him with the criminal process in the first place.[2] It is sad but true. And so it is with this defendant: how long will he irrevocably hold on to his pledge? Looking at his character and history, proof of a much more convincing nature than that now before us is imperative for this court to believe in the alleged change in defendant's outlook.

\* \* \* \* \* \*

---

2. *See, e. g., United States v. Poynter*, 489 F.Supp. 604, (S.D.N.Y. 1980).

While we have grown accustomed to expect it, we still deplore the absence here too of true contrition. Regardless of the defendant's low evaluation of the narcotics law he offended, in which he is joined, he says, by those he considers members of "respectable society," he stands convicted of one of the most serious felonies on the books. The community's welfare is sadly abused when citizens take it upon themselves to pick and choose which laws—good or bad—they will obey. There exists a legal remedy for overturning a federal law no longer desired; but while the law exists, it is the law of the land.

What of defendant's present finger print record? Will that, like an albatross, always hang around his neck? We have seen vast numbers of defendants with similar demerits overcome them, rise and conquer. Has this defendant the capacity "to live it down?" That depends on his own force of will and future behavior.

Counsel for movant puts it bluntly: "while [defendant] knew the illegality of cocaine, he didn't appreciate the immorality of it. . . . [Defendant] was involved with cocaine, and only cocaine, because of its widening acceptance in many segments of 'respectable society.' . . . [T]he defendants here did not feel that they were involved with a dangerous item, whether that is the case or not. They were not intentionally doing anything immoral or harmful, but clearly they were all aware of its illegality." Cohen Affidavit at 5–6. This is neither the time nor the place to expand, but suffice it to say that this court will never be able to blot from its mind the image of an endless line of victims of cocaine usage, their dependence upon it, their criminal violations in order to get it, so that life for them becomes a hopeless affair, saturated with despair and ceaseless lament. As to the "respectable society" of cocaine purchasers and users, the word "respectable" is sadly abused, for in essence they are aiders and abetters with the princi-

pals, the drug pedlars, who procure and sell "the stuff."

Repeatedly we learn that certain users of illegal drugs who take them for their "personal desire and satisfaction," claim they "know how to control" its usage (positive scientific conclusion to the contrary notwithstanding) but they are completely unmindful, of course, that the vast majority of such users succumb to its dreadful "hold" on them, usually committing crimes to satisfy their cravings.

Defense counsel urges that defendant "now realizes the terrible mistakes he has made. He is desperately craving the trust which his father had in him. . . . He is no child any longer which he has been in spite of his age. . . . [W]ith his fortieth birthday coming up, he knows it is time to take control. . . . I can attest to the fact that he now has begun to understand that in 'conning' others, he was really 'conning' himself. This Court's evaluation at the sentencing that the defendant was not true to himself and was a faker, I believe to be an apt description. This Court's conclusion that the defendant was 'running away from (responsibility) all the time,' has begun to sink in with Mr. Beasley." Cohen Affidavit at 10, 14.

We do not doubt that defendant "idolized" his father and will keep his memory ever green. On the merits his father may have deserved nothing less, but really over the many years during his father's life time, did not the defendant let him down? What, then, is a judge, an impersonal figure and a complete stranger, to expect?

Counsel states further: "If [defendant] were released now, would anyone seriously contend that after this entire experience, [he] is going to have anything to do with drugs or any criminal behavior?" Cohen Affidavit at 7. This Court answers affirmatively. We are not unaware of counsel's faith in the defendant. It is matched by others who have his interests at heart. What we have revealed herein, based on our experiences over many decades,[3] is that de-

---

**3.** Mr. Justice Oliver Wendell Holmes observed that "The life of the law has not been logic; it has been experience."

**1234**

fendant's character "record" gives us considerable pause. If it were otherwise, we might have imposed a different sentence which would not require a motion to reduce.

\* \* \* \* \* \*

It has long been our unpleasant duty to mete out sentences to offenders.[4] Our obligation under law to do justice to this defendant and to the community alike would have been less burdensome if we had not had to face up to the facts herein disclosed having a direct bearing on, and pertinent to, defendant's sentence. The possibility of defendant succeeding in ripping away those harmful factors of character which have brought him to his present confinement, is a challenge not to be avoided. He has the confidence of friends and attorney, but the greatest effort must come from him alone. His counsel puts it well: "[W]hat happens in the future, as he now knows what happened in the past, will be of his own making." Cohen Affidavit at 6.

We do not despair of the defendant's chances ultimately to achieve those additional values which go into making a person of good moral character, which will enable him to climb and stay on higher ground. In view of what is known of the whole man before and since our sentence was imposed, completely satisfactory evidence of rehabilitation, including true contrition, cannot presently be convincingly established by relatives, friends and attorney alone. The presentation of evidence of solidly embedded values which will assure his own good moral living and present no danger to the community is best left to the behaviorists, the psychiatrists and scholars in allied fields whose impressive testimony might well turn the tide in defendant's favor.

■ For the reasons counsel assigns, Cohen Affidavit at 15–16, we shall endeavor to promptly contact the Director of Prisons and urge that this defendant serve his sentence closer to New York. We are in sympathy with counsel's plea that "the trip to Ashland [Kentucky] makes it almost impossible for anyone to visit him on a regular basis. . . . [I]t is critical for Mr. Beasley's progress to have the help, guidance and support of his loved ones."

As we see it, based on the impressive evidence before us, we have no alternative. We are constrained to, and do, deny the application for reduction of sentence in all respects.

SO ORDERED:

---

4. "I am not envious of this Court's position when human conduct must be evaluated to determine an appropriate sanction." Cohen Affidavit at 9.