Stephen William **FERGUSON**, Petitioner,

v.

**UNITED STATES of America.**

**No. 77 Civ. 2479 (IBC).**

United States District Court,
S. D. New York.

Feb. 23, 1978.

---

Stephen William Ferguson pro se.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for U. S.

OPINION

IRVING BEN COOPER, District Judge.

The petitioner moves pro se pursuant to 28 U.S.C. § 2255 to vacate his sentence on the ground that at the time sentence was imposed we failed to find that he would derive "no benefit" from sentencing under

the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026. For the reasons discussed herein, we deny petitioner's application in its entirety.[1]

On November 14, 1966 the petitioner pled guilty to one count of conspiracy to commit bank robbery (18 U.S.C. §§ 2, 2113) and to one substantive count of assault with a deadly weapon in the course of robbing a bank (18 U.S.C. § 2113(d)). By reason of his plea petitioner in effect admitted being the gunman in a robbery of the Tremont Savings & Loan Association, Bronx, New York, in which over $20,000 was taken (see Official Minutes, January 5, 1967, at 11). This court sentenced petitioner on January 5, 1967 to a term of twelve years on the substantive count, with the proviso that he would be eligible for parole at such time as the Board of Parole should determine, 18 U.S.C. § 4208(a)(2). We suspended execution of sentence on the conspiracy count and placed the petitioner on probation for one day. With the benefit of a full presentence report, and other reliable material before us, it was our considered decision not to sentence petitioner pursuant to provisions of the Youth Corrections Act under which he was eligible.[2]

Petitioner sets forth in his moving papers the following claims: that at the time of sentencing he was nineteen years old; that at no time did the court explain to him that he was eligible for sentencing pursuant to the Youth Corrections Act; and that the court made no finding as to whether he might benefit from sentencing under that program.

28 U.S.C. § 2255 provides to a prisoner, in federal custody by reason of a judgment, the right to move the sentencing court for relief where it appears that "the sentence was imposed in violation of the Constitution or laws of the United States . . . ." We would be duty bound to grant petitioner's request were we to find that the sen-

---

1. A misfiling of this case in the office of our law clerks accounts for this belated disposition; we are distressed by and regret it.

2. The term "youth offender" is defined in 18 U.S.C. § 5006(e) as "a person under the age of twenty-two years at the time of conviction . . . ."

tence as imposed by this court was illegal in any respect. After a thorough study of the files, records and transcripts relating to the sentence under attack, as well as the relevant authorities, we conclude that the sentence imposed was free of any legal infirmity.

The Federal Youth Corrections Act ("the Act") was enacted in 1950 "to make available for the discretionary use of the Federal judges a system for the sentencing and treatment of persons under the age of 22 years who have been convicted of crime in the United States Courts that will promote the rehabilitation of those who in the opinion of the sentencing judge show promise of becoming useful citizens, and so will avoid the degenerative and needless transformation of many of these young persons into habitual criminals." H.R.Rep.No.2979, 81st Cong., 2nd Sess., *reprinted in* 1950 U.S.Code Cong. Service p. 3983.

While the Act itself served to broaden the inherently wide scope of sentencing discretion by providing judges with an optional system, the Supreme Court ruled in 1974 that to further the rehabilitative aims of the Act it was imperative that an express finding of "no benefit" be made on the record pursuant to § 5010(d) of the Act before a judge could proceed to sentence a youth offender under any other applicable provision of law. *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).[3] As stated in *Dorszynski*, 418 U.S. at 443, 94 S.Ct. at 3052, "[t]he requirement of the 'no benefit' finding was designed to insure that the sentencing judge exercised his discretion in choosing not to commit a youth offender to treatment under the Act."

We have studied with care the minutes of the sentencing proceeding and we note that there was no explicit finding of "no benefit" placed on the record, although the option of youthful offender treatment was mentioned in passing by defense counsel and by the court.[4] However, the transcript, fourteen pages in length, reveals a most careful and thorough consideration of this particular individual in light of the acts committed and the uncertain practical probabilities that he would "turn himself around" and start to rebuild his life at that time. This has been our constant practice, always mindful that justice is due both defendant and accuser (community) alike.

Our determination to deny petitioner the benefit with which we deal here was, in effect, an implicit finding of "no benefit" following a studied consideration of all factors taken into account prior to sentencing. Nevertheless, at present only an explicit finding would suffice to constitute compliance with the *Dorszynski* rule:

> If the finding may be implied from the record, appellate courts must go on to determine what constitutes a sufficient showing of the requisite implication. To hold that a 'no benefit' finding is implicit each time a sentence under the Act is not chosen would render § 5010(d) nugatory; to hold that something more is necessary to support the inference that must be found in the record would create an *ad hoc* rule. Appellate courts should not be subject to the burden of case-by-case examination of the record to make sure that the sentencing judge considered the treatment option made available by the Act. *Dorszynski*, 418 U.S. at 443–44, 94 S.Ct. at 3053.

\* \* \*

---

**3.** 18 U.S.C. § 5010(d) reads as follows: "If the court *shall find* that the youth offender will not derive benefit from treatment under subsection (b) or (c), then the court *may* sentence the youth offender under any other applicable penalty provision." [emphasis added] While the Act requires an explicit finding of "no benefit" there is no requirement that such finding be accompanied by a statement of supporting reasons. *Dorszynski v. United States*, 418 U.S. 424, 441–42, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

**4.** In the course of the sentencing proceeding, defense counsel, Mr. Sanders, made the following remarks:

> Now, if the Court pleases, I have made no other applications as to this defendant because I believe in your Honor's exercising of discretion and wisdom your Honor will find in your Honor's experience dealing with boys who have gone astray this way, youthful offender treatment and things of that sort. [Official Minutes, January 5, 1967, at 12]

The personality profile revealed by petitioner at time of sentence

*Indictment*: Count I: That petitioner and two co-defendants "unlawfully, wilfully and knowingly did . . . conspire . . . with each other . . . by force and violence and by imtimidation, would take . . . money . . . in the care . . and possession of the Tremont Savings and Loan Association, . . . Bronx, New York . ., . and with intent to steal . . . would take money . . . in possession of the [Association] . . . further a part of said conspiracy . . . the defendants, in committing the offenses described . . . would assault and put in jeopardy the lives of persons by the use of a dangerous weapon . . . a revolver."

Count II: Petitioner and co-defendants ". . . by force and violence and by intimidation did take from . . . Salvatore L. Pannullo money in the approximate amount of $20,680 . . . in the care and possession of the . . . Association . . .

Count III: Petitioner and co-defendants . . . "with intent to steal and purloin, did take and carry away money in the approximate amount of $20,680 . . . in possession of the . . . Association . . .

Count IV: Petitioner and co-defendants "in committing . . . the offenses . . did assault and put in jeopardy the life of . . . Pannullo by the use of a dangerous weapon . . . a revolver."

On November 14, 1966 petitioner entered a plea of guilty to counts 1 and 4. Subsequently, counts 2 and 3, on consent of the litigants and with Court approval, were dismissed.

*Details of the offense*: Ferguson's version coincided in all respects with the following official recital except that he stated he used a toy pistol in the holdup and robbery:

On 8/26/66, defendants Russ, Ferguson, and Brown robbed the Tremont Savings & Loan Association, Bronx, N.Y. of $20,680. Defendants Russ and Ferguson entered the bank, Ferguson brandishing a pistol and covering the employees and customers, while Russ vaulted the tellers' counter and removed cash from 3 teller cages. Russ first filled a shoebox with loot, and then used a paper bag taken from a teller's cage.

Defendant Brown was the driver of Russ' car which was used in the robbery, a 1961 green Chevrolet with Florida license plates. The 3 men escaped in the car, went to Russ' apartment, and split the loot 3 ways.

Later, on the same day, agents of the FBI spotted the vehicle double-parked on W. 125 St., and Russ was later apprehended when he entered the car. Russ confessed to his involvement, and directed the agents not only to his apartment where his share of the loot was hidden, but also implicated Ferguson and Brown as accomplices.

A consent search of Russ' apartment of 8/27/66 disclosed $6,321, secreted in a paper bag, and hidden on the floor in back of a chest of drawers.

Ferguson was arrested on the same date at a later hour at his home, 271 E. 143 St., Apt. 3–B, Bronx, and he was in possession of a fully loaded 32 Smith and Wesson revolver. At first Ferguson denied knowledge of the crime, but a search of his home disclosed $6,610 in a paper bag taken from the bank, and this money had been secreted in a blue pillow case and hidden under a baby's crib. Next to the bag authorities found another revolver, allegedly the one displayed at the time of the robbery.

A search of Russ' car disclosed numerous sets of handcuffs, cuts of adhesive tape, and cut lengths of clothes line rope. Russ denied knowledge of the fact that these items were in the trunk of the automobile.

Latent fingerprints taken from the automobile by the authorities established the identify of co-defendant Brown, and he is still being sought by the authorities, described as possibly armed and dangerous.

Noteworthy is the fact that the N.Y.C. Police Dept. continues their investigation of these 3 defendants with respect to a series of armed robberies of various business firms in the greater New York area. It is further believed by local authorities that the defendants have been involved in at least 2 murders in connection with the alleged robberies.

*Petitioner's prior criminal record:* At the time we imposed sentence on this petitioner, we were officially informed:

| DATE | PLACE | OFFENSE | DISPOSITION |
|---|---|---|---|
| 11/ 2/62 | Bronx, N.Y. | Delinquent child (Possession of knife and blackjack) | 11/5/62, Bronx County Children's Court, discharged with warning |
| 7/25/63 | Bronx County, N.Y. | Assault with gun | 10/28/63, Bronx County Criminal Court, treated as a Youth Offender; sentenced to the NYC Reformatory; ESS; placed on probation; probation terminated 1/18/65 |
| 4/ 6/65 | New York City | Felonious assault, possession of gun | 4/29/65, Supreme Court, Bronx County, N.Y., 1 year, released NYC Penitentiary, 12/2/65 |
| 8/27/66 | New York City | Bank robbery | Current Case |
| 8/29/66 | New York City | Armed robbery (Committed 5/26/66) | Pending, Criminal Court, Manhattan, Docket # A–11287; detainer pending |

*Other details of petitioner's background:* From official sources we also learned that since his marriage defendant was under no financial pressure; that along with wife and child, he lived in a comfortable home with his wife's parents (a teacher's aide and a glazier); that as a student at many schools he maintained a very poor scholastic standing due to excessive absences—a school "problem." Our probation department, which over the years has earned our high regard, reported that Ferguson gave this impression: "an emotionless, nonrevealing, unhappy, mentally dull, hostile, brazen young man . . . unsavory background."

While a final adjudication had not been reached at the time we imposed sentence, we were alerted to a criminal charge against petitioner (a detainer outstanding) then pending in the Criminal Court, Manhattan, "alleging that on or about May 26, 1966 the defendant did commit the crime of armed robbery of the Domestic Finance Company, 421 7th Avenue, New York City and took the sum of $2,500 under gunpoint."

*Petitioner's letter after sentence:*

In his undated, hand-written letter addressed to us in March, 1967 (two months after sentence), he wrote: "I [sic] you can see some justification in giving me a chance by a youth sentence . . ." We were constrained to write him on March 13, 1967: "Upon re-examining your entire file . . believe[s] it would be to your best interests and that of the community if the sentence already imposed remain [sic] undisturbed."

\* \* \*

Throughout approximately four decades of our judicial effort in this City, we have concentrated on the problems and challenges which the sentencing process presents, with special emphasis on the youthful offender—our determination to render meaningful justice to him and community alike.[5] The object of sentence, then, should be to fit the sentence not to the crime alone, but to the offender as well.

---

**5.** For example, see each Annual Report by the Chief Justice, Court of Special Sessions, City of New York, for 1951–1960; *U. S. v. Unterman,* 422 F.Supp. 228 (S.D.N.Y.1976).

With great frequency we have observed the unfolding of an endless panorama of human misery made up of offenders charged with crime invariably saturated with moral turpitude. They included youth and young adult offenders. These awesome experiences left indelible impressions which helped in forming an estimate of this particular defendant. The law does not require a judge to anesthetize his emotional reflexes. "Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference. * * * Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine." *In re Linahan,* 138 F.2d 650, 652 (2d Cir. 1943).

We have heard offenders retrace the bitter steps of their downfall, the throbbing pause of uncertainty following arrest when life seemed to stand still, including the sorrow of parents and the apprehensiveness of friends, the scorn and withdrawal of neighbors, the sense of being trailed.

The therapeutic impact of arrest, fingerprint, incarceration—this thorny and tearful path for many such offenders (it is youth and young adult defendants solely with which this opinion deals) creates an unwanted but deep indentation. Often it is sufficient to stabilize a defendant for the rest of his life against almost any temptation to overt action. He emerges from the ordeal with an overwhelming conviction that the nets of the snarer are all about him.

Insofar as a sentence is a prescription for remedial treatment of the crime as a given personality syndrome, judges must have information about the constitution of the delinquent and the extent of his moral involvement. And so there are more vital questions: How normal, in physical health, mentality, emotional stability, capacity for sustained effort is he? What were the provocations provided by the complainants; and by the community in which he was reared and which set the behavior patterns after which he moulded himself? How powerful are these upon him now? What capacity for sound living has he shown to date? What is his ability to learn to integrate new experiences? What is his moral potential? What resources will be needed to free this potential? Who stands ready to help him? Can he learn faster in the community or does he require to be withdrawn from associations and conditions in which he has been formed? What kind of community will give him the support he must have? What incentives can the community provide to help energize his will?

The key to intelligent sentencing, therefore, is the court's knowledge of the amount and kind of disciplinary action, in the light of the offender's moral standards and educability (capacity and rate of learning), that will be needed to restore him to his place in the community with sound attitudes toward it.

Not in a single instance have we failed to examine into the applicability, in youth cases before us, of the benefit of youthful offender treatment. Without hesitation, we state for the record that we did exactly that in this case and concluded that no benefit to defendant would be derived by a sentence under the Federal Youth Corrections Act. What we are stating is that after due deliberation we chose, at the time sentence was imposed, "not to commit [this] youth offender to treatment under the Act." *Dorszynski,* supra, 418 U.S. at p. 443, 94 S.Ct. at p. 3052.

* * *

"The life of the law has not been logic; it has been experience." (Mr. Justice Holmes). And so we were prompted to talk frankly with petitioner on day of sentence (January 5, 1967). Excerpts follow:

. . . there is nothing under the law that compels a judge to say anything to you at the time of sentence. I can call off a number and the marshals would put their arms on yours and take you away . . . I never have done it that way. I am going to tell you why I am going to hand you the sentence I am going to mete out.

. . . your lawyer had occasion to refer to this judge's work in another court. In that other court I never had or hardly ever had the opportunity of examining a detailed report with the human being who stood before me as a defendant.

. . . Your record of behavior is an ugly one.

If I were your doctor and you were to say to me, after examining you, "Doctor, where do I stand?" Then I would say, "Ferguson, you've got to have an operation." You wouldn't like to hear that. But if you had faith in the doctor you would say, "Go ahead."

So I've got to give it to you straight. You're a bad boy, a very bad boy. I'm not saying that there isn't a chance that you will straighten out. I've got faith in people no matter how bad they are, but I would be stupid if I counted on you to straighten yourself out. You'd have a bullet in your head if I allowed you to do it by yourself, or you would give someone else a bullet.

I spent pretty near two to three hours going over your report. I never met you before, but I want[ed] to be sure I am doing the right thing. I took the X-rays. I took all the tests on you. And I have looked and I have looked again in the hope that I could see something that would give me another course to follow. And I decided that I want you helped, but not the way you would like to be helped. Your idea of an ideal solution is for a judge to say, "I'll give you a chance to make good; I'll turn you over to the solicitude of a probation officer." [emphasis added] That is like give you aspirin when you need the doctor's knife to get rid of something that is eating at you.

We afforded him the chance to prove himself while confined, to reach for, and climb up to, higher ground, and thereby earn his early release (18 U.S.C. § 4208(a)(2) would have enabled the parole board to release him even before service of one-third of his sentence):

. . . there is a chance under the section under which I am going to impose sentence for you to work your way out of this mess. . . . If you work this out and prove yourself, then the section enables the board of parole to release you. The sentence I hand you is not binding. It can be cut down according to the wisdom of the board. And that, I say, in turn will be dependent entirely upon a showing by you of genuine determination to be a decent human being. . . . .

. . . I saw more than what you have seen by nineteen from the time I was eight, when you talk about misery and being kicked around. And all those experiences taught me that it is possible for a fellow who wants to grab ahold of himself to really climb the ladder. . . So Ferguson I am hoping that after you get in there what I have tried to say to you will begin to make a little sense.

You've got a baby that you fathered. You better ask yourself, if you really love that child, whether you want that child subject to the kind of behavior that you yourself have been guilty of. If you would want done to that child what you up to now have been ready to do to others, if anybody else did it to your child, you would undoubtedly want to strangle him.

. . . They have had a great number of people like you. Many of them have gone from bad to worse, but there have been a good number that have gone from bad way up to the top.

. . . And let the record show further that this Court stands ready to consult with the board, when, as and if the board sees fit to call upon the Court to help review the progress of this defendant.

These extracts (especially the words underscored) show clearly we had ruled out a sentence under the Federal Youth Corrections Act. . . .

There is something to show that petitioner may have listened to us with at least half an ear. In his letter of March, 1967 (hereinabove referred to on page 11) he wrote, "I

also would like you to know that I'm in Lewisburg almost finnish [sic] with my courses to get a high school diploma, and am going to go on to college. I'm getting a lot of self-satisfaction in helping myself get a good education so I can get a decent job, and Lord! only knows stay out of trouble with the law."

\* \* \*

The overriding objective of the Act seeks rehabilitation of the offender. To be effective, however, the steps initiated to achieve that end must be built on at least an outline of foundation existing within him. What had petitioner to offer in that regard and on what could we depend? Totally devoid of even a semblance of character, possessed not even of a nodding acquaintance with moral or ethical values, a total stranger to self-respect, work habits, fair play and fair dealing, a youth already at the threshold of becoming a hardened offender, our course was clear. To prescribe the remedy under the Act would be unthinkable, inexcusable—like stretching hope and wishful thinking to the breaking point, like smearing cologne on gangrene.

We have witnessed throughout our judicial career, and almost without exception, the total collapse of a defendant not quite ready to absorb or appreciate the boon that comes under the Act's benevolent approach; he goes from bad to worse. The prescription simply will be to no avail.

In sharp contrast, we have been elated by the forward steps taken by legions of youthful offenders who were given a chance of rehabilitation under the Act; they climb on to higher ground. Indeed, we have been encouraged, from the very start of our judicial work, to prescribe its benefits where that approach was clearly applicable. We are fully aware that such an offender has defied the community. He is threatened both in depth and extent, and he is insecure about his own integrity. Those who really wish to help him must be prepared to participate in recriminations and discouragements, in false starts, failures, hard ascents and periods of slow gain.

Frequently we have witnessed the moral rejuvenation of many of them: building a value system; the gradual mastery of shame, false pride, fear, hatred; successful participation in socially rewarding activities; the balm of being free of surveillance. And once in a while, we have been privileged to see the process as a whole, from its incubation through the stages of growth, of catastrophy, of therapy, of recovery, and of reintegration—with the scars, it has to be said, plainly visible on the epidermis of both offender and society, but beginning to fade.

Over the years, we have observed the behavior pattern and response to caring hands. We have learned to depend heavily on the recuperative powers of life itself, and trust to a reoriented will to stabilize character. The problem, again and again, relates not alone to what such an offender had done, but what had he become? How do you go about certifying that such a person, once toxic and infectious, might really now be charged with positive health? For repeatedly we have witnessed a defendant erect a platform of self-deceit and on it go down to defeat, and while clinging to it, like the Phoenix, ascend and conquer.[6]

*The Issue of Retroactivity:*

The decision in *Dorszynski* was handed down more than seven years after we imposed sentence on this petitioner. Were that decision to apply retroactively it would technically invalidate not only petitioner's sentence but a host of others imposed by judges in cases disposed of prior to June 26, 1974 when the Supreme Court issued its mandate. We have examined the authorities and have found a discord of opinion. See, e. g., *McKnabb v. United States*, 551 F.2d 101 (6th Cir. 1977) finding of "no benefit" at postconviction proceeding represents substantial compliance with *Dorszynski* standard; *McCray v. United States*, 542 F.2d 1246 (4th Cir. 1976) (per curiam) retroactive application; *Robinson v. United States*, 536 F.2d 1109 (5th Cir. 1976) (per curiam) retroactive application, but post-

6. See *U.S.A. v. Joan Hicks*, 63 Cr. 977 (S.D.N.Y., filed March 11, 1964).

conviction consideration by sentencing judge pursuant to *Dorszynski* makes vacation of sentence and remand a futile gesture; *United States v. Hopkins*, 174 U.S. App.D.C. 244, 531 F.2d 576 (1976) *Dorszynski* rule retroactively applied without discussion; *Jackson v. United States*, 510 F.2d 1335 (10th Cir. 1975) (per curiam) no retroactive application; *Brager v. United States*, 527 F.2d 895 (8th Cir. 1975) (en banc) retroactive application, but violation of *Dorszynski* rule may be cured by current explicit findings at postconviction proceeding; *Chandler v. United States*, 401 F.Supp. 658 (D.N.J.1975), aff'd mem., 546 F.2d 415 (3d Cir. 1976), *cert. denied*, 430 U.S. 986, 97 S.Ct. 1685, 52 L.Ed.2d 381 no retroactive application; alternative holding.

Our search has not disclosed any case from our Circuit which has squarely addressed the issue of retroactive application of the *Dorszynski* rule. Significantly, however, the Second Circuit held in a case decided prior to *Dorszynski*, and analogous to it, that the rule it was announcing therein—that a "no benefit" finding under § 5010(d) must be made explicit on the record by the sentencing judge—would be applied *prospectively* only. *United States v. Kaylor*, 491 F.2d 1133 (2d Cir.) (en banc), *vacated and remanded on other grounds sub nom., United States v. Hopkins*, 418 U.S. 909, 94 S.Ct. 3201, 41 L.Ed.2d 1155 (1974). The court employed a three-prong test as its mode of analysis and inquired into "(1) the purpose of the new rule of law enunciated, (2) reliance by the courts or authorities on the old rule, and (3) the effect of retroactive application on the system of administration of justice." 491 F.2d at 1138.

In limiting the applicability of judicial rulings, the Supreme Court has sanctioned this same approach in both substantive constitutional contexts, *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and decisions based on statutory construction in which no new rights are created, *Michigan v. Payne*, 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973). See also *Bailey v. Holley*, 530 F.2d 169, 172–75 (7th Cir. 1976). In *Halliday v. United States*, 394

U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969), a case cited by our Circuit in *Kaylor, supra*, the Supreme Court used the above criteria in declining to apply retroactively its decision in *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), wherein it held that a defendant could plead anew if the district court did not adhere strictly to Rule 11, Federal Rules of Criminal Procedure, in accepting the plea.

Applying the three criteria set forth above, the Second Circuit in *Kaylor, supra*, reached the following conclusions (491 F.2d at 1138–39):

> The purpose of the rule we enunciate today is clear enough: to make certain that in sentencing a trial judge has considered and rejected the preferred alternative of treatment under the Act as to the individual youthful offender. We accomplish this purpose by requiring explicit findings in every case. We have no doubt, however, that in case after case this alternative has been considered, and rejected, by our conscientious district judges even though their findings of no benefit have been implicit only, as here. And we have great concern lest our burdened federal court system be flooded with new motions to vacate sentences or, indeed, to reopen judgments in which the sentences have long since been served, were we to apply this decision retroactively. Weighing the three considerations together, we decline to make our ruling retroactive and enunciate this decision as prospective only. [Footnote omitted]

Even though the *Kaylor* decision preceded *Dorszynski*, the reasoning of our Court of Appeals maintains its force; nothing in *Dorszynski* serves to dispel this conviction, contrary decisions by other circuits notwithstanding. We conclude that *Kaylor* governs our disposition in the instant case and, accordingly, hold that the *Dorszynski* rule does not apply retroactively so as to invalidate petitioner's sentence for lack of an explicit finding of "no benefit" on the record. Accord, *Jackson v. United States, supra; Marshall v. United States*, 389 F.Supp.

729 (E.D.Wis.1975) (dictum); *Owens v. United States*, 383 F.Supp. 780 (M.D.Pa. 1974), *aff'd mem.*, 515 F.2d 507 (3d Cir.), *cert. denied*, 423 U.S. 996, 96 S.Ct. 425, 46 L.Ed.2d 371 (1975).

Accordingly, petitioner's motion under 28 U.S.C. § 2255 for vacation of sentence is denied in its entirety.

SO ORDERED.